In the Matter of PHILLIP SEELIG, as President of the Correction Officers Benevolent Association of the City of New York, Inc., et al., Respondents, v RICHARD J. KOEHLER, as Correction Commissioner of the City of New York, et al., Appellants.

First Department, October 12, 1989

## APPEARANCES OF COUNSEL

*Irving Anolik* of counsel *(Barbara H. Daly* with him on the brief; *Tellerman, Paticoff & Greenberg,* attorneys), for respondents.

*Michael S. Adler* of counsel *(Francis F. Caputo* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for appellants.

*Joel C. Glanstein* of counsel *(Catherine J. Minuse* with him on the brief; *O'Donnell & Schwartz,* attorneys), for Lieutenants Benevolent Association of the City of New York, *amicus curiae.*

*Adam Ira Klein* of counsel *(James W. Devor* with him on the brief; *Adam Ira Klein, P. C.,* attorney), for Correction Captains Association and others, *amici curiae.*

## OPINION OF THE COURT

Sullivan, J. P.

Respondents, the Correction Department of the City of New York, its Commissioner and the city, appeal from a judgment invalidating, on constitutional grounds, a program for the random drug testing of all correction officers, and enjoining its implementation. Petitioners, the Correction Officers Benevolent Association of the City of New York, Inc. and its president, Phillip Seelig, had challenged the program, which was initiated by a November 17, 1987 directive issued by the Commissioner.

In its statement of policy, the challenged directive, which covers "all members of the uniformed force * * * including the Chief of Operations and the Commissioner", provides:

"Correction Officers are peace officers and hold positions of public trust. The use of illegal drugs by officers is a breach of that trust and completely inimical to their status as peace officers. * * *

"The use of illegal drugs either on or off duty shall be cause for suspension without pay. Members on probation shall be terminated. Tenured members found guilty after an administrative hearing face penalties that include termination."

It further asserts that "the Department has documented a serious drug abuse problem among a significant number of its members", and notes that its purpose is the deterrence and detection of drug abusers for internal departmental use, and not the facilitation of criminal prosecution.

In order to assure neutrality in the selection process, the directive provides for the computer generation of a list of Social Security numbers, programmed to select at random 50 members every two weeks. Thus, approximately 1,300 members will be tested every year. Since the Department currently has 7,100 tenured members, each member will be randomly selected, on average, once every 5 or 6 years.* After being selected, the employees will be notified to report for testing at the Health Management Division at a specific date and time. Failure to report or refusal to be tested or to cooperate with the testing procedure is cause for unpaid suspension. Probationers will be terminated, while tenured employees face discharge after a hearing.

The testing procedures in the directive are modelled after those adopted by the United States Department of Health and Human Resources for the Federal Government's drug-testing program—procedures that were recently upheld by the Supreme Court in *National Treasury Employees Union v Von Raab* (489 US —, 109 S Ct 1384). The directive enumerates a series of steps designed both to protect personal privacy and assure testing integrity. Each test is overseen by a uniformed supervisor or a Health Management Division staff member of the same gender as the employee being tested, who may have a union representative or lawyer present.

The employee is asked to furnish a listing of any medication, alcohol or food ingested within the preceding 24- to 72-hour period. Specimens are furnished, without observation, in a private closed stall. A supervising staff member is present, but remains outside the stall to receive the specimen, which is inspected for signs of irregularity or contamination. In addition, the toilet water in the stall is tinted blue to deter the dilution of specimens. A supervisor who suspects that an employee has tried to adulterate or substitute a specimen is to document his suspicions and order the employee immediately to provide another specimen under direct observation; both specimens are then sent to the laboratory. In any event, if the laboratory report indicates adulteration that finding will provide the basis for disciplinary charges and retesting under direct observation.

After concluding that the specimen is legitimate, the super-

---

* The directive further provides, "Because the selection of members is made on a random basis, some members will never be tested during the course of a year. Other members may be selected more than once".

visor caps the container and seals and labels it in the presence of the employee, who initials both the label and any accompanying forms. In an effort to maintain an unbroken chain of custody, the Health Management Division has the responsibility of supervising the storage, transportation and surrender of specimens to the laboratory for testing.

Specimens are to be tested for marihuana, cocaine, opiates, amphetamines, phencyclidine and barbiturates at an accredited laboratory by means of the thin layer chromatography test and the enzyme multiplied immunoassay technique. Positive findings must be confirmed by a different technique, a gas chromatography/mass spectrometry, which is apparently virtually infallible. Positive samples are to be kept for six months. An employee who has tested positive may arrange for retesting at a State-certified laboratory of his choice.

Petitioners, arguing that drug testing not based on individualized suspicion of drug usage constitutes an unconstitutional search and seizure, and relying largely upon this court's majority opinion in *Matter of Caruso v Ward* (131 AD2d 214), subsequently reversed by the Court of Appeals (72 NY2d 432), and that court's decision in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57), commenced the instant CPLR article 78 proceeding to invalidate and enjoin implementation of the Commissioner's directive. Although they did not present any expert opinion or other evidence to support such contention, petitioners further argued that random testing is unnecessary, since the Correction Department's legitimate interests in deterring drug abuse in the uniformed force can be adequately satisfied by "a more aggressive program of educating superior officers in making observations with a view toward the detection of reasonable suspicion of possible drug usage".

In their answer, which was supported by affidavits from Thomas Murray, the Correction Department's Chief of Operations, and Dr. Robert L. DuPont, a nationally recognized medical expert on drug testing, respondents cited, *inter alia,* the limited expectations of privacy of correction officers, the planned program's reliance upon procedures that minimize privacy intrusions, the compelling government interest in deterring and detecting drug abuse, the evidence of an incipient drug problem within the Department that lesser measures had been unsuccessful in abating, and expert scientific opinion that reasonable-suspicion testing and other measures

short of periodic testing are incapable of meeting the Department's needs.

The court hearing the matter conceded that respondents' interest in detecting drug abuse among correction officers was indeed substantial, but accepted petitioners' argument that alternative less intrusive measures, such as careful monitoring coupled with reasonable-suspicion testing or annual physical testing, would adequately meet the Department's deterrence and detection needs. Accordingly, it granted the petition and enjoined implementation of the directive (140 Misc 2d 783).

We find, in light of the Department's compelling interest in deterring and detecting drug use among correction officers, whose diminished privacy expectations are outweighed by that interest, and its promulgation of detailed regulations which, with respect to such drug testing, are sufficient to prevent unbridled administrative discretion and to preserve privacy to the maximum extent feasible, that the Commissioner's plan is not constitutionally infirm. Accordingly, we reverse.

" 'The operation of a correctional institution is at best an extraordinarily difficult undertaking.' " *(People ex rel. Vega v Smith,* 66 NY2d 130, 141, quoting *Wolff v McDonnell,* 418 US 539, 566.) Prisons are "fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *(Bell v Wolfish,* 441 US 520, 559.) As this record discloses, the duties of a New York City correction officer are especially demanding. Working largely in a confined environment with violence-prone, antisocial inmates who, during any work period, outnumber them at least tenfold, correction officers have a responsibility to see that prisoners strictly conform to prison regimen and requirements; to protect the safety and security of inmates, prison personnel, visitors, and prison facilities; and, generally, to insure that sentences of incarceration properly fulfill their rehabilitative, deterrent, incapacitative, and punitive purposes.

The work of New York City correction officers mandates that they perform at optimum mental and physical levels. For example, they must have the mental acuity to perceive and defuse explosive situations, and to withstand, without overreaction, the torrent of inmate invective to which they are regularly subjected. A correction officer must be physically capable of utilizing a firearm or other weapon, if necessary,

without endangering innocent parties, of intervening to break up fights between inmates, and of exercising vigilance when manning a tower guard post or searching visitors. The position also demands unquestioned integrity, given the endless opportunity for inmate corruption and the incalculable harm that could result.

That correction officers are prohibited from carrying weapons while performing ordinary patrol and supervisory duties is an indication of the peril of their working environment. They are, however, trained in the use of firearms and routinely carry guns while, for instance, performing perimeter guard duty, transporting prisoners, guarding hospitalized prisoners, and searching for escaped prisoners.

Since illegal drug use impairs a correction officer's vital mental and physical ability and compromises his integrity, thus paving the way for corruption and blackmail, the Department has long been concerned about drug usage by the members of its uniformed force. That the overwhelming majority of inmates with whom correction officers deal on a daily basis are either drug addicts or drug users only serves to compound the concern. Indeed, proffered statistics demonstrate that approximately 50% of the Correction Department's inmates are drug addicts, while 90% are at least drug users. Thus, drug-using correction officers have a ready and highly profitable market at hand for the peddling of drugs. Moreover, inmates and their visitors often offer drugs to correction officers as bribes. In 1988, for instance, 43 prison visitors were arrested on drug-related charges.

For a number of years now, the Department has apparently undertaken measures, including intensive educational efforts, to discourage drug use among its members and to weed out abusers. As a supplement to its long-standing reasonable suspicion drug-testing program, it adopted several across-the-board drug-testing programs. All applicants are tested for drug usage. Later, during their probationary period, they are subjected to more drug testing, once during the first several weeks of their training and again at the conclusion of the probationary period. Since July of 1988, the Department has implemented two additional, random drug tests for its probationary officers. Thus, by the end of the 18-month probationary period, all correction officers are now drug tested five times.

Notwithstanding these measures, the Department has con-

cluded, on the basis of alarming statistical evidence, that random drug testing is imperative with regard to tenured correction officers. In the 32-month period between January 1, 1985 and August 31, 1987, for instance, drug-related disciplinary charges were brought against 149 tenured correction officers, over 1.1% per year of the tenured uniformed force. Similarly, in 1988, 88 tenured correction officers, over 1.2% of the force at the time, were either dismissed or forced to resign as a result of drug-related charges.

These percentages are all the more compelling since they represent, not the total number of drug offenders on the tenured force, but merely those against whom the Department, in the absence of any across-the-board drug-testing program for tenured officers, has been able to amass sufficient evidence to bring charges. Other evidence supports the Department's view that there are many more drug offenders on the force who have avoided detection. For example, between January 1, 1986 and August 31, 1987, a total of 2,411 probationary officers were tested at the training academy. Notwithstanding that all of them were given approximately one week's advance notice, 2.9% tested positive. Similarly, the past several years have witnessed a vast increase in the quantity of drugs successfully smuggled to inmates, an increase that, in the Department's view, can be explained only by the active participation of correction officers.

Moreover, recently conducted departmental investigations have uncovered evidence of a large number of correction officers and other prison employees attempting to sell drugs to inmates. Since 1986, 312 officers have been dismissed for drug-use problems, and 20 have been arrested on charges related to drug sales. (See, Prison Officers Tackle Thankless Job, NY Times, Feb. 19, 1989, at 44, col 4; NY Newsday, Mar. 16, 1989, at 19, col 1.)

As this court has recognized, the Correction Department has a compelling interest in deterring drug abuse among the members of its uniformed force. (See, Matter of King v McMickens, 120 AD2d 351, 353, affd 69 NY2d 840.) Clearly, "the duties and responsibilities of correction officers * * * often [call] for the instantaneous availability, if not the use, of 'extraordinary physical effort', in the circumstances of their performance of service". (Matter of Figueroa v Bronstein, 38 NY2d 533, 535.) That effort, however, is adversely affected by drug use, which impairs not only physical performance, whether in the use of firearms or otherwise, but also mental

acuity and judgment, qualities of critical importance in dealing with prisoners. Furthermore, drug-using correction officers are easy victims of corruption and blackmail.

The Department's compelling interest in deterring drug abuse must be measured against the potential for such abuse among New York City correction officers. They are confined each day with violence-prone, antisocial inmates who greatly outnumber them, and against whom they must enforce a myriad of strict regulations. With the expansion of departmental hiring over the past several years, most officers are quite young, in their early twenties, with relatively limited experience. Due to an ever increasing prison population, they are often required to work overtime. Indeed, even petitioner Seelig has been quoted as saying that correction officers "must work within standards that require more restraint than most people could endure." *(Prison Officers Tackle Thankless Job,* NY Times, Feb. 19, 1989, at 44, col 5.) In a society in which many of our citizens resort to drugs—so many, in fact, that studies indicate that six million use marihuana almost daily, 5.8 million use cocaine at least monthly, and one sixth of the work force between the ages of 20 and 40 use marihuana at least monthly (NY Times, Oct. 10, 1986, at 14, col 1)—it is fair to assume that, in a group subject to especially severe tensions, the temptation similarly to seek relief in illicit drugs will be strong. Compounding the risk is the correction officer's ready access to narcotics as a result of the environment in which he works.

Even though the constitutionality of an across-the-board drug-testing program does not turn on a showing of the inefficacy of less intrusive measures *(see, Skinner v Railway Labor Executives' Assn.,* 489 US —, —, n 9, 109 S Ct 1402, 1419, n 9), the record here amply demonstrates that reasonable-suspicion testing has not adequately met the Department's compelling needs. This inadequacy, of course, strengthens the governmental interest in the challenged program. In this regard, it should be noted that drug abuse frequently fails to generate the telltale signs that might otherwise give rise to reasonable suspicion. As Dr. DuPont, the former Director of the National Institute of Drug Abuse and a preeminent national expert on the subject explains, unlike alcohol abuse, whose intoxication produces a general global brain defect that affects coordination, balance, speech, and fine movements, cocaine, marihuana and amphetamine abuse produces a type of intoxication which is difficult to detect, even by physicians,

because it largely affects, not the primitive parts of the brain that control speech and motor functions, but, rather, those parts of the brain which control higher functions such as judgment, decision-making, reactivity and motivation. Intoxication of the latter type can have a devastating effect on the performance of a correction officer. While the balancing of interests may justify society's acceptance of the risk of such undetectable impairment with respect to some classes of government employees, in the case of correction officers the risks are too great.

The Supreme Court has acknowledged that reasonable-suspicion testing is an ineffective method for the deterrence of drug abuse among employees whose duties involve high risks or hazards. In rejecting the argument that individualized suspicion of drug abuse is a constitutional prerequisite to the postaccident drug testing of railroad workers, the court held: "[T]he government interest in testing without a showing of individualized suspicion is compelling. Employees subject to the tests discharged duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences. * * * [E]mployees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others. An impaired employee, the Agency found, will seldom display any outward 'signs detectable by the lay person or, in many cases, even the physician.' * * * This view finds ample support in the railroad industry's experience with Rule G, and in the judgment of the courts that have examined analogous testing schemes." *(Skinner v Railway Labor Executives' Assn., supra,* 489 US, at —, 109 S Ct, at 1419.)

Unlike *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57, *supra),* where a school district, without even a single instance of drug abuse in its experience, sought to impose periodic drug testing on teachers, the drug problem among tenured correction officers is not speculative. As the statistical data reflects, the Department is confronted with a serious problem. Also alarming is the recent increase in the smuggling of drugs into prisons, an increase, already resulting in the death of at least one prisoner from a drug overdose that, in the Department's view, can be explained only by the participation of correction officers. Also disturbing are the deaths of several correction officers as a result of drug overdosages and the apprehension of others actually selling drugs in the Rikers Island parking lot.

On the basis of such a record, the Commissioner has concluded that the challenged random drug-testing program is the most appropriate of the various possible remedies to fulfill the Department's objectives. This considered administrative determination is entitled to substantial judicial deference. As the Supreme Court has noted: "[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *(Bell v Wolfish, supra,* 441 US, at 547.) Our Court of Appeals has similarly recognized that, in carrying out their "formidable tasks in the violative setting of our correctional institutions", prison officials should "be vested with broad discretion in their formulation of security-related policies." *(Matter of Rivera v Smith,* 63 NY2d 501, 513; *see also, Matter of Doe v Coughlin,* 71 NY2d 48, 59.)

In balancing the privacy interests of the correction officers against the compelling necessity for periodic drug testing, we do not believe that the minimal intrusiveness of the challenged testing will seriously erode the officers' reasonable expectations of privacy. Not all governmental employees enjoy the same level of expectation of privacy. The privacy expectations of any particular group is markedly diminished by such factors as the employees' voluntary pursuit of a position they know to be pervasively regulated for reasons of safety and the employees' acceptance of severe intrusions upon their privacy. *(National Treasury Employees Union v Von Raab,* 489 US —, 109 S Ct 1384, *supra; Skinner v Railway Labor Executives' Assn.,* 489 US —, 109 S Ct 1402, *supra; Matter of Caruso v Ward, supra,* 72 NY2d, at 440.) Correction officers are traditionally among the most heavily regulated groups of governmental employees and also among those who accept the greatest intrusions upon their privacy. A number of courts have held that correction officers, because of the confined environment in which they work, the strict security measures governing their conduct, and the other distinctive features of their employment, have diminished expectations of privacy with regard to security-related employer intrusions. *(See, e.g., Poole v Stephens,* 688 F Supp 149, 155; *Policemen's Benevolent Assn. v Township of Washington,* 672 F Supp 779, 793, *revd on other grounds* 850 F2d 133, *cert denied* — US —, 109 S Ct 1637.)

For example, unlike most employees, New York City correction officers are subject to call at any time and must be fit for duty except when on sick leave. (Rules & Regs of NY City Dept of Correction, rule 3.15.020.) Whenever they report sick, they must submit to an examination at home by a Department physician. *(Id.,* rule 3.10.080.) While on sick leave, they are prohibited from leaving their homes except to visit a doctor or hospital or to obtain medication. *(Ibid.)* Furthermore, unlike ordinary employees, correction officers are mandated by the Department to satisfy all of their private financial obligations or face departmental discipline. *(Id.,* rule 3.25.020.)

In the absence of express permission, correction officers are absolutely forbidden to carry packages into or out of prisons. *(Id.,* rule 3.15.160.) When permission is granted, the package must be inspected when the officer leaves or enters the facility. *(Id.,* rule 5.20.050.) Moreover, any car driven by a correction officer into or out of prison facilities is searched for contraband each time. *(Ibid.)* Likewise, all lockers used by correction officers are regularly searched. *(Id.,* rules 5.20.090, 5.20.100.) In addition, a correction officer is, himself, subject to search at any time and force may be used if he refuses to cooperate. *(Id.,* rule 5.20.090.) An officer is also prohibited from engaging in undue familiarity with or doing favors for inmates and making or maintaining any contact with former inmates. *(Id.,* rules 3.60.010, 3.60.030, 3.60.040, 3.60.050.)

In addition, all correction officers are notified before applying for the position and on numerous occasions thereafter that illegal drug usage is absolutely prohibited and will result in applicant disqualification or employee termination, and that drug testing is employed to detect such usage. Moreover, unlike the testing plan designed here, where samples are obtained without observation under conditions which limit the intrusion on personal privacy, each of the five pretenure tests involves the furnishing of samples under direct observation and, hence, represents a greater incursion upon privacy. Having been subjected to these five observed drug tests, a correction officer's expectation of privacy with regard to the plan to administer less intrusive periodic drug tests to each tenured employee once every several years is significantly diminished. *(See, Matter of Caruso v Ward, supra,* 72 NY2d, at 435, 439.)

Recent court decisions refute petitioners' premise that, in the absence of individualized suspicion of drug abuse, drug

testing is unconstitutional and otherwise support the constitutionality of the challenged program. *National Treasury Employees Union v Von Raab* (489 US —, 109 S Ct 1384, *supra)* involved a challenge to the constitutionality of the United States Customs Service's program of administering drug tests, without a reasonable suspicion predicate, to employees seeking promotion or transfer to positions that involve either interdiction of drugs, carrying of firearms, or access to classified information. The program, aimed at both deterrence and detection, was not based upon any palpable drug problem within the agency. In fact, previously administered drug tests had yielded positive results in only about 0.1 of 1% of the cases.

The court noted that if a search otherwise implicating the Fourth Amendment serves special needs beyond those of law enforcement, as is the case of employee drug testing, individualized suspicion may not be constitutionally required where the government interest outweighs the intrusiveness upon the reasonable expectations of privacy. The court found that the governmental interests at stake were compelling, citing, *inter alia,* the employees' exposure to the criminal element and bribes, the grave dangers posed by the possible misuse of deadly force, and the potential evils resulting from those with access to sensitive information being compromised. The court also took note of the Court of Appeals decision in *Matter of Caruso v Ward* (72 NY2d 432, *supra)* and the employees' voluntary pursuit of positions they knew required extraordinary assurance of trustworthiness and probity, as well as the unobserved nature of the testing program and other characteristics that both assure reliability and minimize embarrassment. In expressly rejecting the argument that in the absence of proof of a substantial drug problem within the agency, individual suspicion should be a prerequisite to testing, the court cited the difficulty of detecting drug use through mere observation. It noted, "Where, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal" *(supra,* 489 US, at —, 109 S Ct, at 1395).

In *Skinner v Railway Labor Executives' Assn.* (489 US —, 109 S Ct 1402, *supra),* which involved the constitutionality of postaccident drug testing of railroad workers without a particularized suspicion of drug abuse, the court, finding the governmental interest at stake to be substantial since such employ-

ees "can cause great human loss before any signs of impairment become noticeable to supervisors or others" *(supra,* 489 US, at —, 109 S Ct, at 1419), stated, "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion" *(supra,* 489 US, at —, 109 S Ct, at 1417). As in *Von Raab* (489 US —, 109 S Ct 1384, *supra),* the court found that the testing intruded insubstantially upon the workers' expectations of privacy because of the limited nature of those expectations as a result of their voluntary selection of positions they know to be pervasively regulated for reasons of safety and the lack of direct observation of the sample giving and other features of the testing program that minimize intrusiveness.

Like the classes of employees involved in *Von Raab* and *Skinner (supra),* correction officers have voluntarily chosen occupations known to be pervasively regulated and which demand the utmost assurance of integrity and fitness. Indeed, if anything, correction officers surrender far more of their expectations of privacy than do members of those classes by virtue of, *inter alia,* their working in a confined environment and participation in five pretenure, direct-observation drug tests. Furthermore, the governmental interests at stake in the deterrence and detection of drug abuse among correction officers are at least as strong as those in *Von Raab* and *Skinner.* Moreover, in contrast at least with *Von Raab,* there is in this record the supporting evidence of a disquieting and escalating drug problem.

While both *Von Raab* and *Skinner (supra)* concededly address the issue of whether reasonable suspicion is indispensable to drug testing, neither expressly treats the question of periodic testing. There is, however, strong indication that the Supreme Court would regard periodic testing as equally constitutional for the classes of employees involved as the precise programs considered. Particularly telling in this regard is the heavy emphasis in *Skinner* on the deterrent value of the postaccident testing program: "By ensuring that employees in safety-sensitive positions know they will be tested upon the occurrence of a triggering event, the timing of which no employee can predict with certainty, the regulations significantly increase the deterrent effect" *(supra,* 489 US, at —, 109 S Ct, at 1420). In *Skinner,* all covered railroad workers were

forewarned that they would be tested upon the occurrence of certain types of accidents. Since no employee could predict when such an accident would occur and, thus, when testing would be ordered, the program, in effect, was one resembling random testing where employees are forewarned that they will be selected for testing in the future based upon a triggering event which they cannot predict. The essential difference in the two programs is that the unpredictable triggering event in one is an accident, while, in the other, the selection of one's number by a computer.

Also significant is the court's citation with approval in *Von Raab (supra)* of the Court of Appeals decision in *Matter of Caruso v Ward* (72 NY2d 432, *supra),* which upheld a program involving the random, periodic testing of members of the Police Department's Organized Crime Control Bureau (OCCB), an elite unit, the majority of whose members concentrate on narcotics-related crimes. Out of 1,173 members, drug-related disciplinary charges had been filed against a total of 10 during a period of four years. The program called for the furnishing of samples under the direct observation of a monitor. Having found the giving of a specimen in the presence of a government official or agent as "at least as intrusive as a strip search" in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (supra,* 70 NY2d, at 67-68), the court framed the issue in *Caruso* as: "The central question for us [is] whether a privacy intrusion that we characterized as being 'at least as intrusive as a strip search' may, on this record, be justified so as to permit random drug testing of OCCB members" *(supra,* 72 NY2d, at 439).

In finding the privacy expectations of OCCB members to be insubstantial, the court cited their voluntary decision to join a highly sensitive unit of a paramilitary organization, their acceptance of being on call 24 hours per day and of other restrictions that intrude upon their privacy, and their participation in four observed suspicionless drug tests prior to joining the unit. The court also found the governmental interests at stake compelling, in light of the members' exposure to drug users and traffickers, the risks of perfidious exchanges of classified information and diversion of drugs and the potentially fatal consequences to fellow officers and others as a result of misuse of a weapon. It specifically rejected the contention that the less intrusive measure of reasonable-suspicion testing should be deemed sufficient, noting that the inadequacy of such testing as a deterrent was demonstrated

by the evidence of 10 drug-related cases which occurred in spite of the reasonable-suspicion testing program.

The case for the drug-testing program is, on the whole, more compelling here than in *Caruso (supra)*, where the incidence of drug-related disciplinary cases, 10 over four years among a unit of 1,173 members, represents a rate of 0.2 of 1% per year, contrasted with a known incidence among tenured New York City correction officers of 1.2% per year. The governmental interests at stake here are undeniably strong. Like their OCCB counterparts, correction officers, if physically impaired, can cause serious harm through misuse of their firearms or otherwise. Furthermore, a drug-caused impairment of judgment is just as potentially dangerous in the case of correction officers, who are often called upon to quell explosive situations. In addition, correction officers are similarly heavily exposed to drug offenders and, as a result of bribery or blackmail, can well endanger security and frustrate penological ends by, for instance, leaking confidential information, facilitating escapes and attacks upon informers, and either smuggling, or allowing the smuggling of, contraband into prisons.

Finally, we note that although the court in *Caruso* found it necessary to refrain from a blanket endorsement of the program at issue there because the absence of regulations prevented the court from reviewing "each of the implementing details" *(supra,* 72 NY2d, at 441), the instant program is supported by a detailed set of regulations, substantially similar to the Federal regulations approved by the court in *Von Raab (supra)*, which attempt to preserve privacy and insure reliability and accuracy.

By focusing on the factual predicate which the Court of Appeals found justified the random drug testing in *Caruso (supra)*, viz., the involvement of the affected elite police unit in investigating drug trafficking on a daily basis, the dissent argues that the facts here do not justify such testing. Such a narrow construction ignores the salient facts in this case—the compelling evidence of significant drug abuse among correction officers, as well as the escalation of drug smuggling in the city's prison facilities. If the reference point for discussion on this issue is to be whether an employee, by the very nature of his work, is exposed to drugs, then, on this record, the random drug testing of correction officers is justified. The argument that random drug testing is unnecessary because correction officers work in a self-contained environment and are thus

closely scrutinized is belied by the empirical evidence. In any event, we do not believe the Court of Appeals has so limited the issue. The essence of the decisions in *Caruso* and *Patchogue (supra)*, also relied upon by the dissent, is that the governmental interest in random drug testing must be substantial and the privacy interests implicated minimal. Such a standard has been met here, especially in light of the program's safeguards against unfettered incursions into the officers' reasonable expectations of privacy.

The overwhelming majority of courts that have considered programs for the random, periodic testing of governmental employees engaged in high-hazard or high-risk activities have upheld such programs. In *McDonell v Hunter* (809 F2d 1302), for instance, the Eighth Circuit upheld a program for the random, periodic drug testing of correction officers having regular contact with prison inmates, even though the program was wholly prophylactic in nature and there was no evidence at all of a drug problem among the officers. In *Weicks v New Orleans Police Dept.* (706 F Supp 453), the court, without any evidence of a drug problem, upheld the random drug testing of all members of certain police units, including the public affairs and the special integrity divisions, as well as the special investigations and internal affairs units. In *Transport Workers' Union v Southeastern Pa. Transp. Auth.* (863 F2d 1110, *affg* 678 F Supp 543), the Third Circuit upheld the random testing of transit workers, including transit police officers. Out of a class of 4,440, there was evidence that 8 used drugs in 1986 and 3 used drugs in the first half of 1987. In *Guiney v Roache* (873 F2d 1557 [1st Cir]), the court upheld random drug testing of police officers who carry firearms as well as those who participate in drug interdiction and, in light of *Skinner v Railway Labor Executives' Assn. (supra)* remanded for further consideration as to the other members of the Department. In *National Fedn. of Fed. Employees v Cheney* (884 F2d 603 [DC Cir]), the same court sanctioned the testing of several classes of civilian employees of the military: transportation workers, including air traffic controllers, pilots, and aviation mechanics and aircraft attendants; law enforcement personnel, specifically those engaged as police officers and guards; and the direct service treatment staff of the Alcohol and Drug Abuse Prevention and Control Program. In *Jones v Jenkins* (878 F2d 1476 [DC Cir]), the court upheld, on the basis of repeated incidents of drug-related behavior, the testing of school bus attendants. *(See also, Policeman's Benevo-*

*lent Assn. v Township of Washington,* 850 F2d 133, *supra* [upholding random testing of all police officers, even though no evidence that any police officer ever used drugs]; *Rushton v Nebraska Pub. Power Dist.,* 844 F2d 562 [upholding random testing of nuclear power plant workers having access to sensitive information; evidence that 2 out of 700 in class had used drugs]; *Committee for GI Rights v Callaway,* 518 F2d 466 [upholding random testing in the military]; *Brown v City of Detroit,* 715 F Supp 832 [upholding the random testing of police officers]; *Ensor v Rust Eng'g Co.,* 704 F Supp 808 [upholding random testing of nuclear plant workers]; *Poole v Stephens,* 688 F Supp 149, *supra* [upholding random testing of probationary correction officers]; *Fraternal Order of Police v City of Philadelphia,* US Dist Ct, ED Pa, Apr. 7, 1989, Hannum, J., Civ 88-8511 [approving random testing of police officers]; *American Fedn. of Govt. Employees v Dole,* 670 F Supp 445, *affd sub nom. American Fedn. of Govt. Employees v Skinner,* 885 F2d 884 [approving random testing of critical employees of U. S. Department of Transportation, including law enforcement personnel]; *Mullholland v Department of Army,* 660 F Supp 1565 [upholding random testing of civilian Defense Department aviation employees, law enforcement personnel, armed guards, and handlers of toxic chemicals; evidence that 16 aviation employees had used drugs]; *National Assn. of Air Traffic Specialists v Dole,* No. A 87-073 [upholding annual suspicionless testing of flight service specialists, who convey certain information to pilots; evidence that 45 in class of 26,500 had used drugs]; *City of East Point v Smith,* 258 Ga 111, 365 SE2d 432 [upholding random testing of police officers; evidence showed that only a few officers had used drugs].)

In conclusion, we find that the random drug-testing program at issue is a limited one, compelled by a worsening drug problem affecting a group of quasi-military personnel upon whose mental acuity and physical fitness lives depend, and who have voluntarily chosen an occupation which already imposes significant intrusions on their privacy. Moreover, the program is conservatively designed to prevent unbridled discretion in selection and to preserve privacy to the maximum extent feasible. In such circumstances, it is not constitutionally deficient.

Accordingly, the judgment of the Supreme Court, New York County (Karla Moskowitz, J.), entered on or about October 20, 1989, granting the petition and enjoining implementation of the November 17, 1987 directive providing for random drug

testing, should be reversed, on the law, without costs or disbursements, and the petition dismissed.

MILONAS, J. (dissenting). Confronted with the fact that pervasive drug abuse is justifiably perceived as this Nation's number one problem, the temptation is to seek solutions by diluting civil liberties. However, this court cannot venture beyond the authority of the Court of Appeals and the United States Supreme Court to sanction the random drug testing of correction officers. It is axiomatic that urinalysis for purposes of drug screening is a search which is subject to constitutional scrutiny. In New York State, the law pertaining to drug testing remains that enunciated by the Court of Appeals in *Matter of Caruso v Ward* (72 NY2d 432) and *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57). Unless the Court of Appeals announces a new standard, we are required to follow the law which has been established in our State. In that regard, in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (supra)* the Court of Appeals invalidated a directive by respondent school district requiring all probationary school teachers to submit to urinalysis to detect possible drug abuse, declaring (at 70) that: "The State has a legitimate interest in seeing that its employees are physically fit and that their performance is not impaired by illegal drug usage. The State also has a manifest interest in preventing crime and seeing that those who violate the law are brought to justice. There is little question that these goals would be more obtainable if the State were able to search everyone periodically in an all-inclusive dragnet. If random searches of those apparently above suspicion were not effective, there would be little need to place constitutional limits upon the government's power to do so. By restricting the government to reasonable searches, the State and Federal Constitutions recognize that there comes a point at which searches intended to serve the public interest, however effective, may themselves undermine the public's interest in maintaining the privacy, dignity and security of its members. Thus random searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government's interest is substantial, and safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion".

More recently, the Court of Appeals in *Matter of Caruso v Ward (supra)* again had occasion to consider the issue of drug testing when it upheld periodic random urinalysis of members of an elite voluntary corps within the New York City Police Department known as the Organized Crime Control Bureau (OCCB). According to the court therein (at 439): "We observed in *Patchoque* that all public employees have some diminished expectations of privacy in respect to inquiries by the State into their physical fitness to perform on the job * * *. The privacy expectations of police officers must be regarded as even further diminished by virtue of their membership in a paramilitary force, the integrity of which is a recognized and important State concern * * *. Indeed, this court has held that '[i]t is well established that it is within the State's power to regulate the conduct of its police officers even when that conduct involves the exercise of a constitutionally protected right' *(Matter of Morrisette v Dilworth,* 59 NY2d, at 452, *supra).* On the other hand, the special status of police officers does not alone reduce their expectation of privacy to 'minimal' level in respect to random drug testing. Rather, their status, considered with the substantial privacy intrusions to which these particular OCCB members and applicants already have subjected themselves, reduces their privacy interest to a minimal or insubstantial level such that the admittedly crucial State interest justifies the random testing."

However, the crux of the decision in *Matter of Caruso v Ward (supra)* was the fact that "[c]learly, there is a direct correlation between the substantive work of an OCCB member and drugs that must be considered in evaluating the magnitude of petitioners' privacy interest in not being tested for drug use on the job" (at 440). Significantly, members of the OCCB are in constant contact with those who deal in and abuse drugs, as well as with large quantities of the illegal substances themselves. It is precisely because OCCB officers are so consistently exposed to drugs and those who traffic in drugs that members of this elite group are distinguishable from other police officers, who may not be randomly tested in the absence of reasonable suspicion. Indeed, correction officers, while certainly members of a paramilitary force, are even less exposed to illegal substances than are ordinary police officers since the former operate in a closed, supposedly drug-free environment, and they are not involved in interdicting drug trafficking.

Respondents herein do not allege that city jails are per-

meated with drug dealing and the use of illegal substances. Indeed, while most of the inmates may have a history of substance abuse, the jails themselves are expected to be insulated from drugs, a fact which respondents do not challenge. Rather, they claim that there is evidence that 1.2% of all tenured correction officers and 2.9% of probationary officers are drug users. In view of the close and continuous supervision under which correction officers work, observation which is much more intense than that placed upon police officers, both those in special units and otherwise, it can scarely be found that respondents have demonstrated interests sufficient to justify the random testing of all correction officers.

Not only are correction officers not exposed to the constant temptation encountered by police officers, especially members of such an elite corps as OCCB, who are daily presented with drug transactions, but virtually all of their actions are scrupulously monitored by their superiors. In addition, the Rules and Regulations of the New York City Department of Correction permit searches of correction officers' lockers, cars, personal property and even of their persons while they are on duty. Thus, it is exceedingly difficult for correction officers to transport illegal substances into or out of the facility or to possess drugs while on the job. Yet, respondents propose that all members of the uniformed force of the Correction Department, both those who are in the ranks and those who hold supervisory positions, should be compelled to undergo random urinalysis without the existence of any reasonable individualized suspicion. Moreover, they do so simply on the basis that of their closely observed uniformed staff, hardly more than 1% of their permanent force has been known to indulge in illegal substances and that the nature of a correction officer's job in itself requires stringent scrutiny, including drug testing. Respondents would, consequently, impose the drastic intrusion into an individual's privacy rights entailed by random drug testing in an effort to eliminate a problem which, without minimizing its severity, is posed by only a minute proportion of its uniformed staff. It is urged that because the correction officers' workplace, by its very nature, curtails their expectation of privacy, then the right to privacy can be further abridged by random drug testing. This argument ignores the fact that the environment in which correction officers labor greatly diminishes the need for testing. It is ironic that the precise rationale offered for screening—the reduced expecta-

tion of privacy—provides a compelling reason against its necessity.

However, neither the New York State Court of Appeals nor the United States Supreme Court has ever permitted the random drug testing of the entire work force of a department or agency. Where such screening has been authorized, there has been either a reasonable suspicion that the employee being examined has been using drugs or there is a direct correlation between the duties being performed (i.e., they are armed law enforcement personnel) and the use or availability of drugs. Respondents concede that the two leading United States Supreme Court cases dealing with the legality of urinalysis, *Skinner v Railway Labor Executives' Assn.* (489 US —, 109 S Ct 1402 [Mar. 21, 1989]) and *National Treasury Employees Union v Von Raab* (489 US —, 109 S Ct 1384 [Mar. 21, 1989]), do not concern the sort of unlimited random testing which they wish to implement herein. In *Skinner v Railway Labor Executives' Assn. (supra),* the Supreme Court allowed the testing of railroad workers involved in certain train accidents or violations of safety rules, whereas in *National Treasury Employees Union v Von Raab (supra)* the issue was the testing of customs agents seeking transfer or promotion to certain positions.

It should be noted that in jurisdictions other than New York, legal authority, prior to *Skinner* and *Von Raab (supra),* differs with respect to the validity of randomly testing government workers for drug use. Thus, advocates both for and against the suspicionless screening of various types of public employees can find ample support in the law in favor of their position in that there are numerous cases existing on both sides of the argument. In the short time that has elapsed since *Skinner* and *Von Raab* were decided, a trend appears to be evolving among courts considering this matter to sanction the random testing of at least two general categories of public employees, those in the uniformed forces, particularly police officers; and transportation workers, extending not only to operators but even to those who service vehicles, trains, aircraft, etc., such as mechanics and engineers. A more specialized group of personnel also now deemed to be subject to random drug screening are individuals holding top secret national security clearance. The reason for this development is that in *Skinner* and *Von Raab,* the Supreme Court recognized three governmental interests which, in appropriate circumstances, might be sufficiently compelling to justify man-

datory testing in the absence of individualized suspicion; that is, its concern with maintaining the integrity of the work force, with enhancing the public safety and with protecting truly sensitive information. Accordingly, the first of these interests—ensuring the integrity of the work force—warrants the testing of employees involved in drug interdiction, whereas the second—advancing the public safety—justifies the screening of workers who carry firearms.

In *Guiney v Roache* (873 F2d 1557 [May 11, 1989]) the First Circuit Court of Appeals, relying upon *National Treasury Employees Union v Von Raab (supra)*, sustained the random testing of a least those officers in the Boston Police Department who carry firearms and participate in drug interdiction, finding no relevant distinction in that regard between police officers and customs officers. Similarly, a United States District Court, in *Brown v City of Detroit* (715 F Supp 832 [July 13, 1989]), upheld the drug testing of the Detroit police on the ground that they carry guns and use deadly force. The District Court of the District of Columbia, however, in *Hartness v Bush* (712 F Supp 986 [May 19, 1989]), disallowed the random testing of unarmed employees of the General Services Administration and Executive Office of the President as overly broad. A California District Court, in *American Fedn. of Govt. Employees, AFL-CIO, Council 33 v Thornburgh* (720 F Supp 154 [Sept. 11, 1989]), held that the mandatory urinalysis proposed by the Federal Bureau of Prisons of all employees irrespective of position was not supported by objective evidence, as in *Skinner v Railway Labor Executives' Assn. (supra)* nor targeted at workers who perform specific job functions, as in both *Skinner* and *National Treasury Employees Union v Von Raab (supra)*.

In *American Fedn. of Govt. Employees v Skinner* (885 F2d 884 [Sept. 8, 1989]), the Court of Appeals for the District of Columbia Circuit approved the drug testing of air traffic controllers and other transportation employees, including mechanics, inspectors, engineers and motor vehicle operators, because these employees occupied health- and safety-related positions. That same court, in *National Fedn. of Fed. Employees v Cheney* (884 F2d 603 [Aug. 29, 1989]), had previously permitted the United States Army to proceed with the testing of three types of civilian employees: (1) transportation workers, such as air traffic controllers, pilots, aviation mechanics and aircraft attendants, since the Army has a compelling interest in public safety and security, (2) personnel in occupa-

tions pertaining to law enforcement, specifically civilian police and guards, and (3) the civilian direct service treatment staff of the Alcohol and Drug Abuse Prevention and Control Program. The District of Columbia Circuit, on the other hand, rejected the attempt by the United States Department of Justice to randomly test all prosecutors in criminal cases or employees with access to Grand Jury proceedings but did authorize the screening of personnel having top national security clearance *(Harmon v Thornburgh* (878 F2d 484 [June 30, 1989]). In another case, that same circuit, upon remand by the United States Supreme Court in *Jenkins v Jones* (— US —, 109 S Ct 1633 [Apr. 3, 1989]) upheld the testing of District of Columbia school bus attendants engaged in the transportation of handicapped children after the Supreme Court found the record to include evidence of repeated incidents of bizarre or drug-related behavior on the part of these workers *(Jones v Jenkins,* 878 F2d 1476 [June 27, 1989]). Finally, the District of Columbia District Court, in *American Fedn. of Govt. Employees, AFL-CIO v Cavazos* (721 F Supp 1361 [July 26, 1989]), allowed the United States Department of Education to test a guard, motor vehicle operators and employees with access to sensitive information, but the screening of automatic data processors was not permitted under the access-to-sensitive-information rationale.

New York City correction officers, it is important to point out, although they are peace officers, do not routinely bear weapons on the job or interdict controlled substances and have not been identified as particularly subject to drug abuse. They are also not involved in the maintenance of public safety in the same manner as are transportation workers. Consequently, none of the foregoing recent cases would appear to be directly relevant to the situation before us now. At any rate, this court is bound by the dictates of the New York State Court of Appeals. While it may very well be that, in view of *Skinner v Railway Labor Executives' Assn. (supra)* and *National Treasury Employees Union v Von Raab (supra)* the Court of Appeals will eventually decide to depart from the standards which it has set forth in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (supra)* and *Matter of Caruso v Ward (supra)* we should not anticipate the Court of Appeals, particularly when confronted with an issue so vital as the constitutional guarantees afforded by the Fourth Amendment. Moreover, it is entirely conceivable that the Court of Appeals may conclude that the Constitution of this

State mandates a more stringent interpretation than that placed on the Federal Constitution by the United States Supreme Court and other Federal courts *(see, People v Torres,* 74 NY2d 224). Regrettably, the majority in the instant matter have proceeded further than the New York State Court of Appeals in weakening the right of public employees, which they share in common with all other citizens, to privacy and to be free from unreasonable searches and seizures. In my opinion, there is no legal support in this jurisdiction for the random drug-screening program intended by respondents, and the judgment of the Supreme Court *(see,* 140 Misc 2d 783) should, therefore, be affirmed.

ROSENBERGER and RUBIN, JJ., concur with SULLIVAN, J. P.; MILONAS and ELLERIN, JJ., dissent in a separate opinion by MILONAS, J.

Judgment, Supreme Court, New York County, entered on or about October 20, 1988, reversed, on the law, without costs and without disbursements, and the petition dismissed.