OPINION OF THE COURT
Bellacosa, J.
Members of an elite voluntary corps within the New York City Police Department, the Organized Crime Control Bureau (OCCB), sued the Police Commissioner upon his announcement of a periodic random urinalysis drug-testing program affecting them. The program would require random submission to urinalysis and, thus, differs from the existing unchallenged Department-wide drug-testing program.
 Supreme Court and the Appellate Division granted an injunction and annulled the Commissioner’s Interim Order No. 36. We reverse, vacate the injunction and dismiss the *435 officers’ challenge because the order, on its face, does not transgress State or Federal constitutional safeguards and because it is otherwise premature.
This lawsuit, commenced two days after Interim Order No. 36 was announced, produced injunctive and nullifying relief from the lower courts. Thus, the Commissioner has not officially promulgated implementing regulations specifying the particulars of the program. Two detailed affidavits of the Police Department Chief of Personnel, developed and submitted as part of the evolving litigation, outline an implementation scheme. We cannot rule on those particulars in this form and at this time as that is an insufficient basis on which to adjudicate the validity of the program as applied in individual cases (41 Kew Gardens Rd. Assocs. v Tyburski, 70 NY2d 325, 326; accord, McGowan v Burstein, 71 NY2d 729). However, we must decide the facial constitutional validity of the 1986 Interim Order No. 36, in view of the litigation course charted by the parties, as definitively adjudicated by the lower courts.
The New York City police force has approximately 27,000 officers. The directive at issue applies only to the specialized OCCB, which has approximately 1,100 volunteer officers in it. Up to 90% of these officers are enmeshed in hazardous narcotics-related operations. As part of their "ordinary” work, they infiltrate and associate with underworld operations and personnel, including large and small scale drug traffickers and criminals in a nether world.
Two years ago, the Department sought to expand its monitoring of the OCCB unit and the Commissioner issued Interim Order No. 36. Previously, OCCB members and those seeking assignment to the unit were subject only to the Department-wide drug-testing programs which included drug testing of all recruits upon application to the Department, a second testing during the five-month Police Academy training period, and a third testing at the conclusion of the 18-month probationary period. Additionally, since 1985, under Interim Order No. 13 all tenured police officers are subject to drug testing upon reasonable suspicion of drug usage.
Interim Order No. 36 has two components. First, all officers who apply for service in OCCB would be required to undergo drug testing as part of the application process and would be asked to sign a form acknowledging their understanding of the testing requirement. This is not legally challenged here. The second component provides for periodic random drug *436 testing of every incumbent OCCB member. They would have to sign a form acknowledging their understanding that periodic drug testing is a condition of membership in the Bureau. Incumbents unwilling to accept the condition could transfer out of the Bureau without loss of rank or salary. Any officer in the Bureau who signs the form and later refuses to submit to the testing could be suspended and the refusal could be grounds for dismissal from the Department. Positive results of the urinalysis could be used for departmental disciplinary purposes but not for criminal prosecution.
The day after the Commissioner issued Interim Order No. 36, the petitioners’ union and its president commenced an administrative proceeding before the New York City Office of Collective Bargaining asserting that implementation of Interim Order No. 36 would constitute a work change violating their collective bargaining agreement. The following day petitioners also started this judicial proceeding seeking to block the implementation of Interim Order No. 36 pending the outcome of the administrative proceeding. Petitioners later amended the demand for judicial relief asking for annulment of Interim Order No. 36 as unconstitutional as well as for permanent enjoinment of its implementation. The parties stipulated not to pursue the administrative phase until this litigation was resolved. Notably, our decision today has no bearing on the merits of that collective bargaining proceeding.
The petitioners’ successful challenge in the lower courts rests on a claimed violation of State and Federal constitutional guarantees against unreasonable search and seizure (US Const 4th Amend; NY Const, art I, § 12), directed essentially at the randomness feature. Heavy reliance is understandably placed on the rule and rationale of Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (70 NY2d 57) that plenary drug testing of teachers is constitutionally forbidden absent reasonable suspicion.
In Patchogue we considered the constitutionality of a public school’s declared policy requiring across-the-board urinalysis drug testing of all probationary teachers as a condition to qualifying for tenure. The school district informed probationary teachers that those who refused to provide the test sample would not be recommended for tenure. We held that the mandatory production of a urine specimen was a search and seizure under both the Federal and State Constitutions and that testing for all those teachers, without reasonable suspicion, was forbidden.
*437 Our search and seizure analysis rests directly on the uniquely private nature of the act and the individual’s privacy right, which we accorded a high priority of protection. "Although [urine] is a waste product, it is not generally eliminated in public or in such a way that the public or government officials can gain access to it in order to 'read’ its contents” (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 67, supra). Not only is it inherently private, the urine specimen and what it may reveal about the tested individual are also highly personal, e.g., pregnancy, diabetes, treatment for various medical problems including manic depression, epilepsy, heart disease and schizophrenia, etc. Indeed, the debate is over that urine samples extracted from governmental employees constitutes a search and seizure (see, 3 LaFave, Search & Seizure § 10.3 [e], at 41-42 [1988 Pocket Part]).
The Police Commissioner, recognizing the impact of Patchogue (70 NY2d 57, supra), concedes that the random drug testing announced in Interim Order No. 36 is a search and seizure. He contends, however, that unlike the probationary teachers subjected, across-the-board, to drug testing in Patchogue, the proposed testing of this high risk, highly sensitive, voluntary unit within the police force is reasonable and therefore constitutional.
The constitutionality of a search conducted by a public employer for "noninvestigatory, work-related purposes, as well as for. investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances” as to "both the inception and the scope of the [government] intrusion” (O’Connor v Ortega, 480 US 709, 724-727; see also, New Jersey v T. L. O., 469 US 325). In particular, a search by a public employer may be justified at its inception "when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose” (O’Connor v Ortega, 480 US, at 726-727, supra).
The Supreme Court has not decided whether individualized suspicion is an "essential element” of a valid work-related search (id., at —, 107 S Ct, at 1503), nor has it ruled specifically on the constitutionality of employee drug-testing programs conducted on a uniform or random basis (id., at 728-729, *438 n; but see, National Treasury Employees Union v Von Raab, 816 F2d 170, 175-176 [5th Cir 1987], cert granted — US —, 108 S Ct 1072 [to be argued Nov. 2, 1988]; Railway Labor Executives’ Assn. v Burnley, 839 F2d 575 [9th Cir 1988], cert granted — US —, 108 S Ct 2033 [to be argued Nov. 2, 1988]). Outside the area of public employment, however, the court has. upheld the seizure of individuals in the absence of individualized suspicion only after first determining that the privacy interests at stake were minimal in nature (see, United States v Martinez-Fuerte, 428 US 543 [permitting brief questioning of vehicle occupants at border checkpoint]). The recognition that public employees might suffer a reduced expectation of privacy at the workplace has prompted one renowned authority, in discussing drug testing, to comment that: "[TJhere are a few forms of public employment in which the hazards of even of momentary lapse of attention or judgment are so substantial in terms of the physical danger to fellow workers or the general public, and in which the opportunities for preventive close supervision are so limited that only random or blanket testing will suffice” (3 LaFave, Search & Seizure § 10.3 [e], at 47-48 [Supp 1988]).
As noted earlier, in Patchogue-Medford we applied these operative principles to invalidate a mandatory drug-testing program for probationary teachers. In striking down the testing, Chief Judge Wachtler wrote for the court that under the State and Federal Constitutions “random searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government’s interest is substantial, and safeguards are provided to insure that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion” (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 70, supra [emphasis added]; see also, New Jersey v T. L. O., 469 US 325, 342, n 8, supra). We emphasized that the severe privacy intrusion entailed in urine testing was greater than the intrusion occasioned by the brief detention of individuals at vehicle checkpoints for sobriety inspection which has been permitted in the absence of individualized suspicion (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 69, supra; see, People v Scott, 63 NY2d 518; Delaware v Prouse, 440 US 648). Urine testing “in the presence of a government official or agent,” we observed, "is at least as intrusive as a strip search” and involves a great "intrusion on *439 individual privacy and dignity” (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 67-68, 69, supra). The net result was that the school district’s legitimate State interests in seeing that its teachers were not drug impaired and, generally, in assuring a drug-free school environment did not overcome the very serious privacy intrusion and thus could not justify drug testing without reasonable suspicion.
The central question for us persists whether a privacy intrusion that we characterized as being "at least as intrusive as a strip search” may, on this record, be justified so as to permit random drug testing of OCCB members. Taken alone, the intrusion in this case would fail under Patchogue. But the analysis does not end so simply. There are factors here which take this case beyond Patchogue and render petitioners’ privacy interests insubstantial, thus permitting this urine-testing program to be authorized in the absence of reasonable suspicion.
We observed in Patchogue that all public employees have some diminished expectations of privacy in respect to inquiries by the State into their physical fitness to perform on the job (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 69, supra). The privacy expectations of police officers must be regarded as even further diminished by virtue of their membership in a paramilitary force, the integrity of which is a recognized and important State concern (see, Matter of Morrisette v Dilworth, 59 NY2d 449, 452; Matter of Purdy v Kreisberg, 47 NY2d 354, 361; Flood v Kennedy, 12 NY2d 345, 347). Indeed, this court has held that "[i]t is well established that it is within the State’s power to regulate the conduct of its police officers even when that conduct involves the exercise of a constitutionally protected right” (Matter of Morrisette v Dilworth, 59 NY2d, at 452, supra). On the other hand, the special status of police officers does not alone reduce their expectation of privacy to "minimal” level in respect to random drug testing. Rather, their status, considered with the substantial privacy intrusions to which these particular OCCB members and applicants already have subjected themselves, reduces their privacy interest to a minimal or insubstantial level such that the admittedly crucial State interest justifies the random testing.
Before petitioners applied for assignment to the OCCB they had been tested for drug use by the Department at least three *440 times. After the conclusion of the probationary period, petitioners continued, as do all officers, to be subject to the Department’s "reasonable suspicion” drug-testing standards. In contrast, no similar facts existed in Patchogue showing that the teachers had been subjected to mandatory drug testing in the past or that the school district had a long-standing drug-testing policy with which the teachers were familiar. The teachers there had neither consented to any drug testing nor made any concession as to the justification for such testing. Thus, there was no basis in that case for concluding that the teachers understood and accepted that drug testing was necessary to maintain the integrity of the teaching profession. Moreover, notwithstanding the widespread use of drugs in the schools by students, the teaching positions in Patchogue— unlike the OCCB positions involved here — did not carry with them an obvious drug risk. Clearly, there is a direct correlation between the substantive work of an OCCB member and drugs that must be considered in evaluating the magnitude of petitioners’ privacy interest in not being tested for drug use on the job.
Of crucial significance in this case is that OCCB members have a very diminished expectation of privacy due to their pursuit of service in the elite unit based on conditions known in advance, including many unchallenged components of Interim Order No. 36 itself. All members enter this service informed, fairly and reasonably, that they will be held to the strictest standards of probity and purity, over and above those already imposed on the police force at large. They enter with professionally sophisticated eyes wide open to the reality that they will operate in fishbowl-like circumstances undreamed of by Calpurnia herself. The officers agree to undergo microscopic examinations of their personal lives, their financial affairs and their professional judgment calls. Realistically, the proposed random drug testing in these narrow circumstances is just another layer of an already heightened, persistent and employee-expected scrutiny. Notably, these special officers also enjoy job benefits they sought out, including greater promotional opportunity and exciting challenging work.
The essential error of the lower courts in the instant case is that they gave an absolutist reading to Patchogue’s holding and insufficient consideration to the complementary exception analysis. This case is very different from Patchogue where the school district’s asserted interest in a drug-free teaching staff was limited to ensuring that "its teachers are fit and that *441 drug abuse does not impair their ability to deal with the students” (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, at 69, supra). Here, unlike that case, these elite officers have significantly lowered their own expectations of privacy to a bare minimum level. With that privacy distinction established, we take note of the Police Department’s assertion of a substantial State interest in ensuring that OCCB officers never take drugs. The Commissioner wants to be sure public perception of the OCCB unit and the entire Police Department would not be seriously impaired by these officers taking drugs on or off duty because, in either case, they would be violating the law they have been sworn to uphold and enforce. In a very real sense, these officers are effectively on duty 24 hours a day.
We believe that the Department has established a justifiable interest and responsibility in the periodic testing of special officers constituting its main line offense and defense in the war against drug trafficking. Daily exposure to drug users and traffickers and to offers of drugs, staggering sums of money and other human temptations presents enormous and self-evident risks. The expense alone of maintaining unlawful drug use magnifies the susceptibility of OCCB members to traitorous exchanges of classified information in return for drugs and illegal diversions of seized drugs (see, National Treasury Employees Union v Von Raab, 816 F2d 170, cert granted — US —, 108 S Ct 1072, supra). It is not melodramatic to note even the potentially fatal risks to fellow officers and others if a drug-abusing OCCB officer is called upon to use a weapon while under the influence of drugs in inherently high-risk assignments. The terror-filled world they are working in requires the sternest precautionary safeguards to weed out drug abusers from their own ranks.
Contrary to the dissent’s assertion of an "abrupt about-face”, we simply respond that we are (1) applying Patchogue’s full holding and its important privacy principles, (2) distinguishing Patchogue’s very different facts and employee group; and (3) using the narrow exception elements provided in that very case as applied to the unique facts of this case. We therefore conclude Interim Order No. 36, on its face at least, constitutes a reasonable search and seizure.
We cannot complete the discussion, however, without noting that the contours of this litigation prevent adjudication at this time of the validity of each of the implementing details to be *442 employed by the Commissioner in this program. In that respect, indeed, we emphasize and caution that each officer retains important personal rights of privacy in the implementation of this facially valid program (see, National Treasury Employees Union v Von Raab, 816 F2d 170, cert granted — US —, 108 S Ct 1072, supra), and our decision in no way impinges on their 4th Amendment rights to be secure against unreasonable searches and seizures of their persons, homes, cars, lockers or other personal effects under traditional probable cause standards (see, e.g., O’Connor v Ortega, 480 US 709, 714-718, supra).
There is no merit to petitioners’ additional contention that the random drug testing is "unreasonable” because of the availability of the Department-wide alternative testing procedure-one based on reasonable suspicion. Statistics supplied by the Commissioner indicate that the existing testing program — based on results from that stricter reasonable suspicion threshold — has not deterred drug violations in the OCCB unit. Over a four-year period, narcotics-related disciplinary charges have been filed against 10 OCCB officers. These statistics and their direct relevancy, standing alone, would be meager and unpersuasive to support an assertion of pervasive illegal drug use and thus even a narrow targeted drug-testing program without an individualized reasonable suspicion predicate. But the statistics are informative among all the State interest factors examined in this case.
In sum, we cannot say it is unreasonable to have the additional and exceptional random drug-testing authorization for this special police unit as a deterrent as well as a device to discover unlawful drug users, particularly in view of the minimal expectation of privacy involved. The Police Commissioner’s plan for random drug testing of members of the elite OCCB unit falls within the narrow exception to Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (70 NY2d 57, 70, supra) and is sufficient to withstand a facial constitutional attack.
Accordingly, the order of the Appellate Division should be reversed, with costs, and petition dismissed.