In the Matter of LARRY E. McKENZIE, JR., Appellant, v NORWOOD E. JACKSON, as Commissioner of the Westchester County Department of Corrections, Respondent.

Second Department, November 6, 1989

APPEARANCES OF COUNSEL

*Goodstein & West (Robert David Goodstein* of counsel), for appellant.

*Marilyn J. Slaaten, County Attorney (Kenneth E. Powell* and *Carol L. Van Scoyoc* of counsel), for respondent.

## OPINION OF THE COURT

Rubin, J.

On this appeal, we are asked to determine if random urinalysis testing of probationary correction officers for the purpose of detecting illegal drug use is constitutionally forbidden absent reasonable suspicion. Upon closely scrutinizing the periodic, random urinalysis drug-testing program, we conclude that it is constitutionally authorized in the absence of reasonable suspicion. Factors are present in this case which reduce the privacy interest of probationary correction officers to a minimal level, the public employer's interest in testing is substantial, and safeguards have been provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion.

On February 25, 1986, the Westchester County Personnel Office announced that several vacancies were anticipated for the position of correction officer and that a civil service

examination for the position would take place on April 5, 1986. The posted announcement set forth the minimum qualifications for the position, including the requirement that all applicants submit to a background investigation and a criminal record search to determine suitability for appointment as a correction officer. Under the caption "Background Investigation," the notice reads in pertinent part: "As part of the background investigation process, the candidate may be required to participate in substance abuse testing designated by the Appointing Authority, and thereafter may be required to participate in such testing on a periodic basis during the twelve (12) months probationary period after appointment. Evidence of substance abuse may lead to disqualification from appointment or termination from employment".

The petitioner presumably read this announcement since he applied to take the April 5, 1986 civil service examination for the correction officer position. The petitioner obtained a score on the examination which made him eligible for consideration. On November 5, 1986, the petitioner appeared for an interview before a hiring board of the Westchester County Department of Corrections (hereinafter the Department). During the interview, the petitioner was informed that one of the conditions of his employment as a correction officer would be his submission to drug screening during the 12-month probationary period. The petitioner never disputed the respondent's representation that the hiring board discussed with the petitioner the Department's drug-testing policy. In substance, the policy provided that all newly appointed correction officers would be subject to drug testing on a periodic basis during their probationary term to determine the presence of any illegal drugs and that refusal to submit to a urine analysis and/or a positive test result for illegal drug use would be a ground for termination of employment. At the conclusion of the interview, the petitioner and the members of the hiring board executed a memorandum entitled "Conditions of Employment-Correction Officer", indicating that the drug screening condition of employment had been reviewed with the petitioner at the interview.

In addition, the drug-testing policy was set forth in written form in a bulletin issued by the respondent Commissioner on November 24, 1986, which was to be read at all shift briefings and posted. The bulletin set forth reasons justifying the drug-testing policy. On the same date the Commissioner issued a separate memorandum entitled: "Operational Guidelines:

Drug Testing of Peace Officer Employees During Probationary Period", which enumerated certain safeguards adopted by the Department regarding drug testing. The safeguards included: (1) furnishing the employee tested with a private and secure room, which is documented to be free of any foreign substance; (2) requiring the presence of a supervisor of the appropriate sex to insure that the specimen was from the employee being tested and was produced at the date and time noted; (3) collecting the specimen in a private setting and in a manner that should not demean, embarrass or cause physical discomfort to the employee; (4) documenting each step involved in the collection and processing of the urine sample to establish the proper chain of custody; (5) proper sealing and storage of all specimen samples; (6) providing a two-step procedure for the testing of urine samples, whereby an initial positive test result will not be considered final, pending a second confirmation test; and (7) retention of the sample for another six months to allow for further testing where the second or confirmatory test confirms the presence of drugs.

The petitioner was appointed to the position of probationary correction officer, effective December 1, 1986. On December 2, 1986, the petitioner was again advised of the Department's drug-testing policy and the justifications for such testing when the bulletin of November 24, 1986, was read by Sergeant Shallo to all correction officer trainees. Thereafter, on June 23, 1987, the petitioner and every probationary correction officer on the same shift were required to undergo a urinalysis drug test. According to the lab report, the petitioner's urine sample tested positive for cannabis. On July 17, 1987, the petitioner was informed by the Commissioner that his services as a probationary correction officer were being terminated.

On or about September 9, 1987, the petitioner commenced the instant CPLR article 78 proceeding seeking reinstatement to his position on the ground that the random urine test constituted an unlawful search and seizure since it was not based upon reasonable suspicion. The Supreme Court dismissed the petition, relying on the exception to the "reasonable suspicion" requirement articulated in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ.* (70 NY2d 57). We agree.

In *Matter of Patchogue (supra),* the Court of Appeals held that a urine test compelled by a government employer to detect the use of illegal drugs constitutes a search and seizure within the meaning of both the State and Federal Constitu-

tions (US Const 4th Amend; NY Const, art I, § 12) and that probationary teachers could not be compelled as a condition of tenure to submit to such a test in the absence of reasonable suspicion. However, in striking down the mandatory drug-testing program for probationary teachers, the court recognized the following exception under the State and Federal Constitutions: "[R]andom searches conducted by the State without reasonable suspicion are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government's interest is substantial, and safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion" *(Matter of Patchogue-Medford Congress of Teachers v Board of Educ., supra,* at 70). Although a drug-testing program must meet the reasonableness requirement of the Fourth Amendment, the above exception noted in *Patchogue* takes cognizance of the "longstanding principle that neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion is an indispensable component of reasonableness in every circumstance" *(National Treasury Employees Union v Von Raab,* 489 US —, —, 109 S Ct 1384, 1390; *Skinner v Railway Labor Executives' Assn.,* 489 US —, 109 S Ct 1402). In *Von Raab,* the United States Supreme Court upheld as reasonable the suspicionless testing of employees in the Customs Services who apply for promotion to positions directly involving the interdiction of illegal drugs, or to positions which require the incumbent to carry a firearm *(National Treasury Employees Union v Von Raab, supra).*

In *Matter of Caruso v Ward* (72 NY2d 432), the Court of Appeals relied on the aforenoted exception in upholding periodic random urinalysis of police officers belonging to the Organized Crime Control Bureau (hereinafter OCCB). In reversing the lower court's determination that the random drug testing was unconstitutional, the Court of Appeals noted the lower court error in giving "an absolutist reading to *Patchogue's* holding and insufficient consideration to the complementary exception analysis" *(Matter of Caruso v Ward, supra,* at 440). Unlike *Patchogue,* the Court of Appeals found certain factors present in *Caruso,* which rendered petitioner's privacy interest insubstantial, thus authorizing the urine-testing program even in the absence of reasonable suspicion.

The critical factor supporting the finding that OCCB members had a very diminished expectation of privacy was their acceptance of the job with prior notice that undergoing sub-

stantial intrusions into their privacy would be necessary to maintain the integrity of the position. "All members enter this service informed, fairly and reasonably, that they will be held to the strictest standards of probity and purity, over and above those already imposed on the police force at large. * * * The officers agree to undergo microscopic examinations of their personal lives, their financial affairs and their professional judgment calls. Realistically, the proposed random drug testing * * * [was] just another layer of an already heightened, persistent and employee-expected scrutiny" *(Matter of Caruso v Ward, supra,* at 440). Thus, the Court of Appeals concluded that the petitioners' membership status in a paramilitary force combined with the substantial privacy intrusions to which OCCB members and applicants had already subjected themselves, reduced their privacy interest to a minimal or insubstantial level. In *Patchogue,* however, there was no factual basis for finding that the probationary teachers had sufficient notice prior to acceptance of a teaching position, that submission to periodic drug testing was a condition to qualify for tenure. "[N]o similar facts existed in *Patchogue* showing that the teachers had been subjected to mandatory drug testing in the past or that the school district had a long-standing drug testing policy with which the teachers were familiar. The teachers there had neither consented to any drug testing nor made any concession as to the justification for such testing. Thus, there was no basis in that case for concluding that the teachers understood and accepted that drug testing was necessary to maintain the integrity of the teaching profession" *(Matter of Caruso v Ward, supra,* at 440).

In short, an applicant's awareness of the fact that undergoing random drug testing is necessary to maintain the integrity of the public employment position being pursued, prior to accepting the job, is a major factor which significantly lowers the applicant's expectation of privacy *(see also, National Treasury Employees Union v Von Raab,* 489 US —, 109 S Ct 1384, *supra; Matter of Dozier v New York City,* 130 AD2d 128).

In the instant case, a factual basis exists to support a finding that the petitioner's privacy interest is minimal. All public employees have some diminished expectations of privacy in respect to inquiries by the State into their physical fitness to perform on the job *(Matter of Patchogue-Medford Congress of Teachers v Board of Educ.,* 70 NY2d 57, 69, *supra).* Like police officers, the privacy expectations of correction officers must be regarded as even further diminished by virtue

of their membership in a paramilitary force *(see, Matter of King v McMickens,* 120 AD2d 351, 353, *affd* 69 NY2d 840), the integrity of which is a recognized and important State concern *(Matter of Caruso v Ward,* 72 NY2d 432, 439, *supra).* It is clear that being subject to paramilitary discipline would not alone reduce a correction officer's expectation of privacy to a "minimal" level *(see, Matter of Caruso v Ward,* 72 NY2d 432, 440, *supra).* However, the notification regarding random drug testing that was afforded to the petitioner and his fellow probationary correction officers prior to their acceptance of an appointment in this paramilitary force, combined with their probationary status and submission to other privacy intrusions *(see, Matter of Seelig v Koehler,* 151 AD2d 53), sufficed to diminish their privacy interests to an insubstantial level.

Unlike the probationary teachers in *Patchogue (supra),* here the petitioner had been repeatedly notified, while still an applicant, that undergoing random urinalysis drug testing during the probationary period was a condition to be satisfied in order to qualify for a permanent appointment to the position of correction officer. First, the announcement of the civil service exam for the correction officer position stated that candidates might be required to participate in periodic substance abuse testing during their 12-month probationary period. The petitioner presumably read this notice since he applied to take the exam. Thereafter, on November 5, 1986, during his interview before the hiring board, the petitioner was apprised of the Department's drug-testing policy and signed a memorandum acknowledging his understanding that drug screening was a condition of his employment. Additionally, an applicant who seeks a position that requires the carrying of firearms in the line of duty should reasonably expect effective inquiry into his or her fitness and probity. Such an applicant has a diminished expectation of privacy in respect to the intrusion occasioned by a urine test *(see, National Treasury Employees Union v Von Raab,* 489 US —, 109 S Ct 1384, *supra).* Consequently, the petitioner applied for and accepted the correction officer position with knowledge of the periodic drug-screening program. Since the petitioner had notice of the random drug-testing requirements while still an applicant for the position, he clearly had a choice prior to accepting the position as to whether he wanted to subject himself to such testing and to the diminished expectation of privacy such testing would entail *(see, Matter of Dozier v New York City,* 130 AD2d 128, *supra; Armstrong v New York State*

*Commr. of Correction,* 545 F Supp 728). In light of the repeated notice which the petitioner and the other probationary correction officers were given with regard to the random drug testing, there is a basis for concluding, as in *Caruso,* that he "understood and accepted that drug testing was necessary to maintain the integrity of the [position]" *(Matter of Caruso v Ward,* 72 NY2d 432, 440, *supra).*

Furthermore, the fact the random drug testing was limited to the duration of the petitioner's probationary appointment is also significant. A probationary employee, unlike a permanent public employee, has no property rights in his position and can be discharged without a hearing and without a stated specific reason, provided the discharge is in good faith and not in violation of constitutional, statutory, or decisional law *(see, Matter of Dozier v New York City,* 130 AD2d 128, 129, *supra; Matter of Giannandrea v Meehan,* 117 AD2d 806). Cognizant that an employer's scrutiny of an employee's fitness to perform the duties of the job is heightened during the training period, the probationary employee's expectation of privacy is correspondingly lower than that of a permanent employee.

In reaching the determination that the petitioner's privacy interests in this case were minimal, we also note that the position of correction officer, like that of an OCCB member, carries with it "an obvious drug risk", a factor the Court of Appeals considered relevant in evaluating the magnitude of a petitioner's privacy interest in not being tested for drug use *(Matter of Caruso v Ward,* 72 NY2d 432, 440, *supra; see, e.g., Matter of Seelig v Koehler,* 151 AD2d 53, *supra).* In short, we find that the first threshold of *Patchogue* has been met since the privacy interest of the petitioner, as a probationary employee fully aware of the Department's periodic drug-testing policy even before commencing his employment, is minimal.

Turning to the second prong of *Patchogue (supra),* we agree with the Supreme Court that the Department of Correction has a substantial interest in safeguarding the security of its prisons and in ensuring that probationary correction officers who abuse drugs are not accorded permanent status *(see, Matter of King v McMickens,* 120 AD2d 351, *affd* 69 NY2d 840, *supra).*

The third prong of *Patchogue,* namely, the requirement that "safeguards are provided to insure that the individual's reasonable expectation of privacy is not subjected to unregulated discretion" *(Matter of Patchogue-Medford Congress of Teachers*

*v Board of Educ.*, 70 NY2d 57, 70, *supra)* has also been satisfied in this case. Unlike *Caruso (supra)* where the procedural safeguards were not yet in place, here, the safeguards are clearly set forth in the Department's "Operational Guidelines". A review of these guidelines indicates that they are adequate to protect the individual's expectation of privacy when undergoing such testing. We also note that these procedural safeguards share several similarities and compare quite favorably to the safeguards found to be adequate in *National Treasury Employees Union v Von Raab* (489 US —, 109 S Ct 1384, *supra).*

In sum, under the circumstances of this case, the specific requirements for finding that the random urinalysis drug-testing program falls within the narrow exception identified in *Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (supra,* at 70), have been satisfied. The respondent's program for random drug testing of probationary correction officers during their one-year probationary term withstands close scrutiny and does not transgress the petitioner's State or Federal constitutional rights to be secure against unreasonable searches and seizures, albeit conducted without reasonable suspicion *(see, Matter of Caruso v Ward,* 72 NY2d 432, *supra; see also, National Treasury Employees Union v Von Raab, supra; Poole v Stephens,* 688 F Supp 149 [NJ]). Accordingly, the Supreme Court properly dismissed the proceeding and denied the petitioner's application for reinstatement to the position of correction officer *(see, Matter of Giannandrea v Meehan,* 117 AD2d 806, *supra).*

THOMPSON, J. P., BRACKEN and BROWN, JJ., concur.

Ordered that the judgment is affirmed, with costs.