*89 OPINION OF THE COURT
Bellacosa, J.
The New York City Commissioner of Correction promulgated a random urinalysis drug-testing program for all uniformed officers because, "[i]n spite of an aggressive drug prevention educational program and testing procedures, including an aggressive reasonable suspicion testing program, the Department has documented a serious drug abuse problem among a significant number of its members.” (Record on app, at 30 [Commissioner’s Directive, Nov. 17, 1987].) The union representing the guards and its president brought this article 78 proceeding to block the implementation of the program on Fourth Amendment grounds. State Supreme Court granted the petition and enjoined the testing. The Appellate Division reversed and dismissed the proceeding, with two Justices dissenting. Petitioners appealed as of right, and we granted a stay of implementation of the program pending the outcome of this appeal. We now affirm and uphold the random drug-testing program of the New York City Correction Department.
THE CONTEXT
In 1987, this court grappled with the constitutional implications of random drug testing of probationary school teachers and held that urinalysis drug testing could proceed only on the reasonable suspicion predicate (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57). We disapproved random searches there and observed that they "are closely scrutinized, and generally only permitted when the privacy interests implicated are minimal, the government’s interest is substantial, and safeguards are provided to insure *90 that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion” (id., at 70 [emphasis added]). The following year, this balancing analysis was applied to a particular subset of public employees — the Organized Crime Control Bureau (OCCB) of the New York City Police Department — in Matter of Caruso v Ward (72 NY2d 432). The court concluded — in the presence of "factors * * * which take this case out of Patchogue” — that random drug testing was not unconstitutional (id., at 439). Special emphasis was given to the diminished level of Fourth Amendment expectations of those employees.
In this case also, each aspect of the Patchogue-Caruso exception test is met. We agree with and note especially this cogent summary in Justice Sullivan’s majority opinion below: "We find, in light of the Department’s compelling interest in deterring and detecting drug use among correction officers, whose diminished privacy expectations are outweighed by that interest, and its promulgation of detailed regulations which, with respect to such drug testing, are sufficient to prevent unbridled administrative discretion and to preserve privacy to the maximum extent feasible, that the Commissioner’s plan is not constitutionally infirm.” (Matter of Seelig v Koehler, 151 AD2d 53, 57.)
Our holding today, despite the hyperbolic attributions of the dissenting opinion, does no more than conclude that the particular combination of crucial circumstances comprising the paramilitary workplace milieu of jail guards, their severely diminished privacy expectations under a sedulous set of testing procedures, in the face of the significant State interest, satisfy the analytic and constitutional underpinnings of Patchogue and Caruso — a concededly rigorous set of standards. Key factors, peculiar to this case, which we conclude are sufficient to warrant the substantial intrusion of random testing searches, include:
The employment is in a unique, high-risk, hazardous setting;
The guards have voluntarily agreed to submit to a previously enacted series of urinalyses, both random and suspicion-based;
The guards are already subject to a host of intrusive searches of person and property with no suspicion predicate;
The Commissioner has demonstrated drug use in his ranks and an inability to stop it with currently available procedures;
*91 A guard’s usage increases substantially the inherent dangerousness of illicit drugs, putting at risk the lives of inmates and fellow officers;
A drug-compromised guard establishes a two-way security breach — drugs and weapons are more easily gotten into jail and prisoners can more easily be gotten out;
The challenged testing procedures guard the privacy and dignity of the subjects as carefully as possible;
The accuracy and integrity of the test results are meticulously circumscribed;
A significant appeals process is granted to those who test positive.
Nevertheless, these City of New York jail guards make the argument that they may not be tested for drugs unless the City can show individualized reasonable suspicion. Their claim rests on State and Federal constitutional guarantees against unreasonable search and seizure which apply to urinalysis drug testing (NY Const, art I, § 12; US Const 4th Amend; Matter of Caruso v Ward, 72 NY2d 432, supra; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57, supra; Treasury Employees v Von Raab, 489 US 656; Skinner v Railway Labor Executives’ Assn., 489 US 602).
THE PRIVACY INTEREST
Applicants pursue employment as jail guards with the understanding and acceptance of invasions of personal privacy unknown and unacceptable in the civilian world. We note another particularly apt portion of the majority opinion below: "Not all governmental employees enjoy the same level of expectation of privacy. The privacy expectations of any particular group is markedly diminished by such factors as the employees’ voluntary pursuit of a position they know to be pervasively regulated for reasons of safety and the employees’ acceptance of severe intrusions upon their privacy. (National Treasury Employees Union v Von Raab, 489 US [656], 109 S Ct 1384, supra; Skinner v Railway Labor Executives’ Assn., 489 US [602], 109 S Ct 1402, supra; Matter of Caruso v Ward, supra, 72 NY2d, at 440.) Correction officers are traditionally among the most heavily regulated groups of governmental employees and also among those who accept the greatest intrusions upon their privacy. A number of courts have held that correction *92 officers, because of the confined environment in which they work, the strict security measures governing their conduct, and the other distinctive features of their employment, have diminished expectations of privacy with regard to security-related employer intrusions. (See, e.g., Poole v Stephens, 688 F Supp 149, 155; Policemen’s Benevolent Assn. v Township of Washington, 672 F Supp 779, 793, revd on other grounds 850 F2d 133, cert denied [490] US [1004], 109 S Ct 1637.)” (Matter of Seelig v Koehler, 151 AD2d, supra, at 62.)
Before achieving tenure, Department of Correction employees currently undergo five urinalyses — one each at the beginning and end of an 18-month probation period, and three random tests during probation. In these pretenure urinalyses, a supervisor directly observes the production of the specimen. In the protocol at issue, the specimen is collected behind a closed door in a private stall. Notably, the invalidated procedure in Patchogue and the validated one in Caruso involved direct observation. Petitioners, however, concede the necessity of the more intrusive pretenure program and they do not challenge its constitutionality (see, record on app, at 22 [petition, K 18]; see also, Matter of McKenzie v Jackson, 75 NY2d 995 [decided today]). We note, too, that the OCCB officers also underwent at least three pretenure drug tests, a significant factor leading to our conclusion that "the substantial privacy intrusions to which [they] already have subjected themselves[ ] reduce[ ] their privacy interest to a minimal or insubstantial level such that the admittedly crucial State interest justifies the random testing.” (Matter of Caruso v Ward, 72 NY2d, supra, at 439.) The "unique” circumstances of the OCCB officers in Caruso do not diminish the ratio decidendi of that case or the exception principle from Patchogue on which Caruso built its holding. Of course, the facts in this case are different, as is so with all subsequent cases in which a precedent — the holding — is applied in the traditional common-law process. Thus, the unique fact-specific application here is no less a narrow exception in the Patchogue-Caruso line and represents no "abandoning” of the appropriate constitutional analysis (see, dissenting opn, at 97). Also, the number or categories of particular public employees’ groups is not alone dispositive. Rather, the identification and weighing of all the unique and particular facts of each case governs.
The extremely diminished privacy expectations of the jail guards in this case are initially no less than that of the OCCB members. We added this admonition in Caruso: "our decision *93 in no way impinges on their 4th Amendment rights to be secure against unreasonable searches and seizures of [OCCB officers’] persons, homes, cars, lockers or other personal effects under traditional probable cause standards” (Matter of Caruso v Ward, supra, at 442 [citation omitted]). In those respects, the entire jail guard force has yielded even more privacy protections than the OCCB cadre. For example, the Rules and Regulations of the New York City Department of Correction provide that an officer is subject to search at any time, and force is authorized if the officer is not cooperative (rule 5.20.090). Any car driven by a correction officer in or out of jail facilities is subject to search, as is any package for which the officer has been given permission to carry into or out of a jail (rule 5.20.050). Correction officers’ lockers are regularly searched (rule 5.20.090). It can be confidently stated, therefore, that these jail guards retain the barest minimal privacy expectation, not because they should be afforded any lesser status or constitutional protection and not because they are being treated as "prisoners,” but because it is inherent in their freely chosen work and work conditions. We do not doubt that the majority of these guards are certain to be law abiding, drug free and commendably committed to their tough public jobs. Nevertheless, they suffer a reduced order of constitutional circumspection proportionate to their accepted level of humble privacy expectations.
THE STATE INTEREST
In Matter of Caruso v Ward (72 NY2d 432, 441, supra), we observed that "[t]he terror-filled world [OCCB members] are working in requires the sternest precautionary safeguards to weed out drug abusers from their own ranks”. Yet they work outside in the streets and communities. Jail guards, on the other hand, daily toil among incarcerated individuals, many of whom will pay any price and do any deed to escape or to ameliorate their confinement. A prison is a "unique place fraught with serious security dangers” (Bell v Wolfish, 441 US 520, 559), and its operation " 'is at best an extraordinarily difficult undertaking’ ” (People ex rel. Vega v Smith, 66 NY2d 130, 141, quoting Wolff v McDonnell, 418 US 539, 566). The prevention, detection and resolution of the myriad daily crises in this netherworld demand the acutest sensory awareness, undulled by the use of illicit drugs (see, Matter of Figueroa v Bronstein, 38 NY2d 533, 535). The public employer and society *94 are unquestionably entitled to the guard’s undeviating concentration and split-second good judgment and self-control.
The crucial nature of this State interest is not some hyperbolic or abstract proposition. The Commissioner made the case for random drug testing of the employees on empirical data, on intuitive professional judgment and experience, and only after other methods failed to stem the tide. Despite the Department’s regimen of education and reasonable suspicion testing, in a recent 32-month period, drug-related disciplinary charges were brought against 149 tenured guards. In 1986 and 1987, 2.9% of probationary guards tested drug positive, despite being warned about the tests (see, record on app, at 136-137 [affidavit of Correction Dept Chief of Operations Thomas Murray]). Downplaying the implications of the dreadful data cannot dull the gripping reality. With all the Commissioner’s existing tools in operation, many jail guards were caught in drug-related incidents. These data also stand in sharp contrast to the only 10 OCCB members facing drug-related disciplinary charges over a four-year period in Matter of Caruso (see, 72 NY2d, supra, at 442) and the lack of any evidence of any drug use problem among potential test subjects in Matter of Patchogue-Medford Congress of Teachers v Board of Educ. (70 NY2d 57, supra) and Treasury Employees v Von Raab (489 US, supra, at 672-673).
The Supreme Court’s rationale upholding the constitutionality of suspicionless drug testing of customs agents in Von Raab (id.) offers another instructive perspective. It focused significantly on two components of the agents’ duties pertinent here as well: their responsibility for interdicting drugs and the carrying of firearms. New York City jails are populated by substantial numbers of the State’s criminal drug users; half the inmates are drug addicts and 90% are drug users or abusers. Guards represent a critical barrier between inmates and suppliers on the outside; drug-compromised guards breach that barrier and that makes them and this case very different from most others.
Petitioners-appellants, nevertheless, suggest that random drug testing is not needed for them in any event since they "generally do not carry firearms while on duty and the number who do is absolutely at a minimum” (appellant’s brief, at 22). This suggestion seems disingenuous, since Department policy forbids guards to carry firearms because they operate in places too dangerous for guns. Guards are outnum *95 bered by the inmates and are denied weapons because the Department knows that many prisoners, already illegally armed with makeshift devices, would thus have the potential to acquire real weapons taken from the guards in their midst (see, record on app, at 133 [affidavit of Chief of Operations of NY City Dept of Correction]). The primary "weapon” of the guard is alert, clear-headed, measured responsiveness to a daily, unrelentingly tense, caged coexistence.
These jailers are on call 24 hours a day and, "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from [their supervisors] personal information that bears directly on their fitness.” (Treasury Employees v Von Raab, 489 US, supra, at 672, citing Matter of Caruso v Ward, 72 NY2d, supra, at 441.) Indeed, OCCB officers "regularly” interact with the drug world inhabitants out in the hard streets; jail guards "constantly” interact with the most dangerous of society’s concentrated mass in the confines of their walled symbiotic universe. We conclude that jail officials must be allowed to use proportionate and constitutional means to prevent, or at least to lessen, the volatile infiltration of drugs into the jails in and on the bodies of the guards themselves.
THE PROCEDURAL SAFEGUARDS
We now assess the adequacy of the program’s proposed protocols, and whether the tested employees are subjected to "unregulated discretion” (Matter of Caruso v Ward, 72 NY2d, supra, at 438; Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d, supra, at 70). A computer randomly selects 50 officers (out of a force of 7,200) every two weeks. A tenured officer may be discharged for refusing to comply with test procedures, but only after a hearing. The employee being tested may be accompanied by a union representative or attorney. State-of-the-art techniques — substantially the same as those approved by the Supreme Court in Von Raab (Treasury Employees v Von Raab, 489 US 656, supra) — are to be used in collecting the specimen, assuring its integrity, preserving it for challenge and for testing and retestings. If the sample tests positive, it is retested by a more sophisticated method to ensure reliability. If the result is unchanged, the employee who supplied the sample may choose a different State-certified laboratory to test the sample yet *96 again. As noted earlier, the specimen is produced in a private, closed stall, unlike the directly observed procedures elsewhere countenanced. The protocols overall allow for very little discretion and certainly not that which could be called "unregulated discretion”. Finally, they assiduously protect the residual privacy expectations of the guards.
CONCLUSION
By choosing to work in the paramilitary milieu of the City Correction Department, guards voluntarily sacrifice certain cherished freedoms. The search procedure we authorize today, after satisfaction of our rigorous standards, is an exceptional reasonable addition, albeit a significant one, to a long list of other searches, also significant in their places, times and contexts, to which these uniformed guards have already submitted themselves. Our holding portends no avalanche of such searches or any diminishment of our vigilance in the protection of constitutional safeguards.
Accordingly, the order of the Appellate Division should be affirmed, with costs.