Chief Judge Wachtler
(dissenting). The majority’s decision, permitting random urine testing of the entire uniformed force of the New York City Department of Correction, represents an unwarranted extension of the narrow exception permitting such searches only under the most extraordinary circumstances.
The narrow exception on which the majority relies may well be applied, as it was in Matter of Caruso v Ward (72 NY2d 432, 434, 441), to an "elite voluntary corps within the New York City Police Department” which constituted "its main line [of] offense and defense in the war against drug trafficking.” In that case we emphasized that the "[d]aily exposure to drug users and traffickers [and] staggering sums of money” set this small, elite group apart from other police officers. Significantly we did not hold that police officers generally, who might occasionally be subject to the same temptations, could also be subject to random urine testing and indeed we held that they could not (Matter of Caruso v Ward, supra, at 439). Instead we took great pains to point out that we were only recognizing a "narrow exception” on "unique facts” involving "these particular officers” who were members of an "elite
*97 corps” who "specialized” in "hazardous drug-related investigations” and who volunteered for this special duty knowing well in advance "that they will be held to the strictest standards of probity and purity, over and above those already imposed on the police force at large” and thus "will [have to] operate in fish-bowl like circumstances undreamed of by Calpurnia herself’ (Matter of Caruso v Ward, supra, at 434, 435, 439, 440, 441).
With this narrow exception in hand, the majority now permits periodic, random urine testing of every uniformed member of the Department of Correction in the City of New York. It does so by abandoning many of the unique, limiting factors present in Caruso and adopting instead a "fact-specific” analysis which apparently will vary from case to case without fixed or discernible limits.
Following this precedent, it would be difficult to imagine how any officer, or anyone employed in the world of law enforcement or even anyone associated with the criminal justice system, would be free of the requirement of random, suspicionless urine testing once someone in authority found it desirable. This turns the narrow exception into a general warrant permitting the government to intrude in the most offensive manner on the privacy and dignity of a large segment of our community.
There is no question that a urine test ordered by the government to detect drug abuse constitutes a search under both the State and Federal Constitutions (Matter of Patchogue-Medford Congress of Teachers v Board of Educ., 70 NY2d 57; Matter of Caruso v Ward, supra; Treasury Employees v Von Raab, 489 US 656; Skinner v Railway Labor Executives’ Assn., 489 US 602). It is also clear that under special circumstances the government may require persons serving the public to submit to such test on a random basis without the constitutional protections generally indispensable to any search (Matter of Caruso v Ward, supra; Treasury Employees v Von Raab, supra; Skinner v Railway Labor Executives’ Assn., supra). This is not an ordinary exception, but actually a double exception to what the Constitution generally requires: a warrant and probable cause or reasonable suspicion. It is also clear from our cases that this extraordinary exception is only available in the narrowest of circumstances.
In Matter of Patchogue-Medford Congress of Teachers v *98 Board of Educ. (supra), we held that probationary teachers in the public school system could not be required constitutionally to submit to random urine testing for drug abuse. We noted that those who chose to work for the government, including teachers, have a diminished expectation of privacy because of the State’s legitimate interest in determining their fitness to perform their jobs and that this permitted the State to require them to submit to urine testing whenever there was reason to believe that they were using drugs. The school district was not required to obtain a warrant or establish probable cause. But we rejected the district’s argument that the teachers’ expectation of privacy was so diminished that they could be subjected to random urine tests at the will of the employer. We noted (at 70): "random searches conducted by the State without reasonable suspicion are closely scrutinized, and are generally only permitted when the privacy interests implicated are minimal, the government’s interest is substantial, and safeguards are provided to insure that the individual’s reasonable expectation of privacy is not subjected to unregulated discretion.” We found this narrow exception inapplicable in that case because a compelled urine test is not a minimal intrusion on the dignity and privacy of the individual and could not be justified by the State’s general interest in determining the fitness of its teachers and maintaining a drug-free environment in the schools.
More recently in Matter of Caruso v Ward (supra), as noted above, we upheld a random urine test program as applied to an elite unit of police officers in the New York City Police Department. The opinion there shows that urine testing constitutes a great intrusion on an individual’s privacy which cannot be permitted unless the individual’s job is uniquely sensitive and thus the public accountability so great that the expectation of privacy is insubstantial.
Relying on Patchogue, we held that such an intrusion is not warranted with respect to public employees generally although their expectations of privacy are diminished to some extent by the State’s legitimate right to inquire into their ability to perform the job. But we also held that police officers generally could not be required to submit to such tests although their privacy expectations were "even further diminished by virtue of their membership in a paramilitary force, the integrity of which is a recognized and important State concern.” (Matter of Caruso v Ward, supra, at 439.) If we were only dealing with ordinary police officers, we noted, the ran *99 dom tests could not be sustained because "the special status of police officers does not alone reduce their expectation of privacy to 'minimum’ level in respect to random drug testing” (Matter of Caruso v Ward, supra, at 439).
What we found determinative in Caruso was that the officers involved were not ordinary police officers, but "special officers”. They had volunteered from the ranks to participate as select members of an "elite group”, with special job benefits and career opportunities, which specialized in investigating highly sensitive drug transactions, and which by definition and common understanding called for performance and integrity, and thus public accountability, well beyond what was expected of police officers generally. On those unique facts we were persuaded that the privacy expectations of these particular officers had become insubstantial and that a narrow exception was warranted permitting the police department to require these particular officers to submit to periodic urine testing. We noted that by voluntarily seeking this special assignment and accepting the extraordinary public scrutiny which it necessarily required they had "already * * * subjected themselves” to "substantial privacy intrusions” well "above those already imposed on the police force at large.” (72 NY2d, supra, at 439, 440.)
Now we have before us a case in which the Commissioner of Correction in the City of New York wants compulsory random drug testing for every uniformed member of his Department. The Commissioner urges, and a majority of this court agrees, that these employees have no reasonable expectation of privacy with respect to these tests because of the following factors: they are members of a paramilitary organization, are authorized to carry firearms, are deemed to be "on duty” 24 hours a day, are charged with enforcing the laws including those relating to illegal drugs, that they are therefore subject to corrupting influences which may impair their integrity and ability to perform in emergencies and that they voluntarily chose the position, consented to extensive background investigations and submitted to periodic drug testing during their probationary terms. In addition there is evidence that a small percentage of correction officers have been involved in illegal drug usage or transactions in the recent past.
All of this is true, but it is also true of police officers generally. In fact the only apparent distinction between these officers and ordinary police officers is that correction officers *100 enforce the law in the controlled environment of a secure correctional facility, where they are not generally permitted to carry firearms, and are not likely to be exposed to large drug deals or staggering sums of money that other officers encounter on the streets. To be sure all those passing through the prison’s gates, employees and visitors alike, may reasonably be subject to limited searches of clothing and personal possessions for contraband. But submitting to screening of that nature is not an open invitation to the more intimate search involved in urine testing.
Moreover, the fact that these officers are subject to such close supervision and constant scrutiny shows that the employer here is in a better position than any to detect illegal drug use by observation at the workplace. The employer can subject officers to a personal search at any time; their cars— and any packages they carry — can be searched as they enter and leave the facilities; their lockers are regularly searched; and they work in a confined atmosphere, subject to close supervision. There is, therefore, no basis for relieving this employer of the minimal reasonable suspicion requirement. If reasonable suspicion is inadequate under the circumstances of this work environment, then it will always be inadequate and this limitation on the narrow exception is a nullity.
What the majority has done in effect is to treat prison guards as prisoners. Its reliance on Bell v Wolfish (441 US 520), to demonstrate a diminished expectation of privacy in the prison environment is telling because the case deals with the rights of prisoners. Those who enforce the law in a jail certainly should enjoy greater privacy rights than those who have been confined.
In short, this case deals with ordinary law enforcement officers performing normal patrol duties in the correctional institutions; it does not involve a small segment of the Correction Department or an elite corps of officers subject to extraordinary scrutiny beyond what is expected by law enforcement officers generally. Indeed, in many parts of the State, the Sheriff’s Department performs both police roles interchangeably, enforcing the law in the streets and in the prisons. To apply the exception permitted in Caruso which was prompted by the unique factors present there, in a case where they do not exist, converts the narrow exception into a broad one without tolerable, predictable or even durable limits.
The government can always argue, as the Commissioner *101 does here, that random urine testing is the only effective means for detecting drug abuse. In Caruso, the necessity for such testing was urged because OCCB officers operated in the field, independently, not subject to the ready observation of their superiors; in direct contrast, it is now argued that correction officers must be so tested precisely because of their confinement in close quarters, where obviously they are subject to the ready observation of their superiors. And arguments can always be made that one group or another serving the public, even in the private sector, should be above suspicion of drug use and thus subject to random urine testing ordered by the government. The arguments are difficult to resist because urine testing is effective and eradication of illegal drug usage is such a desirable goal.
But they are equally difficult to reconcile with the Constitution when the result is a progressive erosion of prior restrictions and a continuous expansion of the government’s power to search large segments of our community without a warrant, without probable cause, and without reason to suspect them of illegal acts. Searching thousands of innocent people to discover a few offenders has long been considered the hallmark of unreasonableness. This basic constitutional principle was not meant to protect only criminals, or those suspected of crime; it was designed to protect us all, including those who serve in the law enforcement community. It is neither reasonable nor just to expect those who routinely enforce the law to submit to indignities which those who violate the law can constitutionally escape.
Even if the present drug crisis abates, these precedents will endure. Today’s decision makes an important constitutional right the latest casualty in the war on drugs.
Judges Simons, Alexander and Hancock, Jr., concur with Judge Bellacosa; Chief Judge Wachtler dissents and votes to reverse in a separate opinion in which Judges Kaye and Titone concur.
Order affirmed, with costs.