[825 NYS2d 201]

Mayor of the City of New York, Appellant, v Council of the City of New York, Respondent, and Lillian Roberts, as Executive Director of District Council 37, AFSCME, AFL-CIO, et al., Intervenors-Respondents.

First Department, December 5, 2006

**APPEARANCES OF COUNSEL**

*Michael A. Cardozo, Corporation Counsel*, New York City (*Mordecai Newman, Larry A. Sonnenshein* and *William S.J. Fraenkel* of counsel), for appellant.

*Jay Damashek,* New York City (*Tisha M. Jackson* of counsel), for Council of the City of New York, respondent.

*Gladstein, Reif & Meginniss, LLP,* New York City (*Walter M. Meginniss, Jr.* of counsel), for Patrick Bahnken, respondent.

*Eddie M. Demmings,* New York City (*Leonard Polletta* of counsel), for Lillian Roberts and another, respondents.

*Joan Stern Kiok,* New York City, for David Rosenzweig and another, respondents.

### OPINION OF THE COURT

McGUIRE, J.

This dispute between the Mayor and the City Council over the validity of local laws affecting the collective bargaining process turns on the distribution, between the executive and legislative branches, of governmental powers conferred by state statutes and the City Charter. We conclude that Supreme Court correctly upheld the validity of the two local laws.

The New York City Collective Bargaining Law (Administrative Code of City of NY, tit 12, ch 3) draws a significant distinction between uniformed and nonuniformed employees. For uniformed employees, "all matters, including but not limited to pensions, overtime and time and leave rules . . . shall be negotiated [by the Mayor] with the certified employee organizations representing the employees involved" (Administrative Code § 12-307 [a] [4]).

For nonuniformed employees, by contrast, individual unions representing particular groups of personnel do not negotiate all terms and conditions of employment. Rather, matters "which must be uniform for all employees subject to the career and salary plan [i.e., nonuniformed employees], such as overtime and time and leave rules" (Administrative Code § 12-307 [a] [2]), are negotiated in a citywide agreement. As to these matters, the representative bargaining for all the employees is the "organization, council or group of certified employee organizations" that represents more than 50% of the nonuniformed employees in the city work force (*id.*). Accordingly, the union for any particular unit of nonuniformed employees may not have a seat at the negotiating table on these matters, but all nonuniformed employees are bound nonetheless by the citywide agreement. The nonuniformed employees of a particular bargaining unit may seek a variation from the citywide agreement, but the variation itself is subject to collective bargaining. Thus, the Collec-

tive Bargaining Law specifies that "nothing contained herein shall be construed to deny to a public employer or certified employee organization the right to bargain for a variation [from the citywide agreement] . . . where considerations special and unique to a particular department, class of employees, or a collective bargaining unit are involved" (*id.*).

Each of the local laws at issue on this appeal, which were enacted in 2001 over the veto of then-Mayor Giuliani, amended the Collective Bargaining Law by adding a sentence at the end of paragraph (4) of subdivision (a) of Administrative Code § 12-307. Local Law No. 18 (2001) of the City of New York, pertaining to persons employed by the New York City Fire Department as fire alarm dispatchers and supervisors of fire alarm dispatchers (collectively, FADs), provides as follows: "For purposes of this paragraph only, employees of the uniformed fire service shall also include persons employed by the fire department of the city of New York as fire alarm dispatchers and supervisors of fire alarm dispatchers" (*see* Administrative Code § 12-307 [a] [4] [i]). Local Law No. 19 (2001) of the City of New York added an essentially identical sentence with respect to persons employed by the New York City Fire Department as emergency medical technicians, advanced emergency medical technicians and their supervisors (collectively, EMTs) (*id.*).

If valid, the effect of Local Laws 18 and 19 would be to exempt EMTs and FADs from the citywide agreement and confer on them the same authority enjoyed by uniformed personnel to negotiate with the Mayor all terms and conditions of employment. In other words, through their unions, EMTs and FADs would be guaranteed a seat at the negotiating table, and could not be bound by a collective bargaining agreement to which they were not signatories and which resulted from negotiations in which they did not participate. Local Laws 18 and 19 thus would curtail the authority the Mayor currently enjoys under the Collective Bargaining Law to negotiate and enter into collective bargaining agreements that bind EMTs and FADs without the participation of their respective unions.

The Mayor, as the chief executive officer of the City of New York (NY City Charter § 3), is invested by the Public Employees' Fair Employment Act (the Taylor Law) with the exclusive power and authority to bargain for and negotiate agreements with employee organizations (*see* Civil Service Law § 201 [12]). The role of legislative bodies such as the City Council is delineated as well by the Taylor Law. In relevant part, it

provides that "[e]very [local] government . . . , acting through its legislative body, is hereby empowered to establish procedures . . . to resolve disputes concerning the representation status of employee organizations of employees of such government" (Civil Service Law § 206 [1]). The Taylor Law also "permits local government bodies—including New York City—to enact substantive and procedural provisions governing labor relations, so long as they are 'substantially equivalent' to the Taylor Law (Civil Service Law § 212 [1], [2])" (*Matter of Levitt v Board of Collective Bargaining of City of N.Y., Off. of Collective Bargaining,* 79 NY2d 120, 126 [1992]). Other significant powers vested in local legislative bodies by the Taylor Law include the power of final approval of collective bargaining agreements whenever funds must be appropriated or legislative action otherwise is required to implement an agreement and render it binding (Civil Service Law § 201 [12]; § 204-a [1]).

Although the Taylor Law is itself a source of (and a limitation on) the City Council's authority to enact laws bearing on labor relations, it is not of course the sole source of that authority. The home rule provisions of the State Constitution confer upon "every local government" the "power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to" specified subjects, including "[t]he powers, duties, qualifications, number, mode of selection and removal, terms of office, compensation, hours of work, protection, welfare and safety of its officers and employees" (NY Const, art IX, § 2 [c] [ii] [1]; *see also* Municipal Home Rule Law § 10 [1] [ii] [a] [1]).

The Mayor concedes that "[t]he Council may, of course, amend the Collective Bargaining Law," but urges that the "Council may not . . . promulgate amendments that are precluded by the State Taylor Law." The Mayor is correct in both these respects, and in stressing that Local Laws 18 and 19 curtail the scope of the authority he currently enjoys under the Collective Bargaining Law. Local Laws 18 and 19, however, are not precluded by the Taylor Law. As the Third Department has stated, a local law which "impairs the full range of negotiations to which the city is entitled under the Taylor Law . . . is inconsistent therewith and unauthorized and prohibited" (*Matter of Doyle v City of Troy,* 51 AD2d 845 [1976]). Although Local Laws 18 and 19 "impair[] the full range of negotiations" to which the Mayor is entitled under the Collective Bargaining Law, they do not impair any authority conferred on the Mayor by the Taylor Law.

At bottom, the Mayor's Taylor Law claim can succeed only if the Taylor Law confers on the Mayor the right or authority not to negotiate with a particular group of city employees over certain terms and conditions of employment. More specifically, the validity of the Taylor Law claim depends on whether some provision of the Taylor Law empowers the Mayor to negotiate "matters which must be uniform for all employees subject to the career and salary plan" (Administrative Code § 12-307 [a] [2])—i.e., nonuniformed personnel—only with the "certified employee organization, council or group of certified employee organizations . . . which include more than fifty percent of all such employees" (*id.*). Unquestionably, the Collective Bargaining Law confers precisely that authority on the Mayor. But absent a provision of the Taylor Law conferring the same authority, the City Council is not prohibited, at least by the Taylor Law, from exercising its constitutional and statutory authority to amend the Collective Bargaining Law and curtail that authority.

That the Mayor cites no such provision of the Taylor Law is unsurprising, for its terms are inconsistent with the Mayor's position. First, the declared purpose of the Taylor Law is "to promote harmonious and cooperative relationships between government and its employees and to protect the public by assuring, at all times, the orderly and uninterrupted operations and functions of government" (Civil Service Law § 200). As the Legislature went on to state, "[t]hese policies are best effectuated by (a) granting to public employees the right of organization and representation, (b) requiring the state, local governments and other political subdivisions to negotiate with, and enter into written agreements with employee organizations representing public employees which have been certified or recognized . . . ." (*Id.*)

Another provision of the Taylor Law is even more to the point. Civil Service Law § 204 (2) provides as follows:

> "Where an employee organization has been certified or recognized pursuant to the provisions of this article, it shall be the exclusive representative, for the purposes of this article, of all the employees in the appropriate negotiating unit, *and the appropriate public employer shall be, and hereby is, required to negotiate collectively with such employee organization in the determination of . . . the terms and conditions of employment of the public employees as*

*provided in this article, and to negotiate and enter into written agreements with such employee organizations in determining such terms and conditions of employment"* (emphasis added; *see also Board of Educ. for City School Dist. of City of Buffalo v Buffalo Teachers Fedn.*, 89 NY2d 370, 377 [1996] ["one of the described inducements for enactment of the Taylor Law was to ameliorate the potentiality or tendency of public employers to impose unilateral conditions upon public employees"]; *Levitt,* 79 NY2d at 129 ["the obligation to bargain is a strong and sweeping policy of the State, not lightly overridden"]).

As is evident, the Taylor Law does not authorize the Mayor or any local government not to negotiate with a union representing a group of municipal employees and thereby impose upon them terms and conditions of employment to which they have not acceded. Accordingly, Local Laws 18 and 19 are not invalid as "inconsistent" with and "unauthorized and prohibited" by the Taylor Law (*Doyle,* 51 AD2d at 845).[1]

For this reason, it does not matter—at least with respect to the challenge based on the Taylor Law—that under Local Laws 18 and 19 the EMT and FAD unions, as the Mayor correctly puts it, "now get something for nothing." What they get is a right that is consistent with the Taylor Law and, in conferring that right, Local Laws 18 and 19 do not deprive the Mayor of anything to which he "is entitled under the Taylor Law" (51 AD2d at 845). As the chief executive officer of the City, the Mayor enjoys exclusive authority under the Taylor Law to bargain and negotiate on behalf of the City with employee organizations over the terms and conditions of employment. However, the benefit conferred by Local Laws 18 and 19—the

---

1. We express no opinion on the distinct question of the validity under the Taylor Law of the provision of the Collective Bargaining Law that enables the Mayor to bind all municipal employees subject to the career and salary plan through negotiations with a union or unions representing more than 50% of the employees. We note, however, that the Collective Bargaining Law does not purport to preclude a union or unions representing less than 50% of such employees from bargaining with the Mayor over *all* terms and conditions of employment, including those agreed upon by the Mayor and the union or unions representing more than 50% of the employees. To the contrary, the Collective Bargaining Law expressly recognizes the "right to bargain for a variation or a particular application of any city-wide policy or any term of any agreement executed pursuant to the [citywide agreement] where considerations special and unique to a particular department, class of employees, or collective bargaining unit are involved" (Administrative Code § 12-307 [a] [2]).

right to bargain and negotiate directly with the Mayor—is not itself a term or condition of employment over which the Mayor's authority is exclusive under the Taylor Law. As Supreme Court correctly recognized, Local Laws 18 and 19 do not confer any other benefit, and do not affect in the slightest the exclusive authority the Mayor enjoys under the Taylor Law to bargain and negotiate over the terms and conditions of employment with employee organizations. Far from running afoul of the Taylor Law, Local Laws 18 and 19 represent valid exercises of the authority, expressly recognized by the Taylor Law, of a local government, "acting through its legislative body, [to] adopt[] by local law, ordinance or resolution, its own provisions and procedures" relating to labor relations, provided they are consistent with the Taylor Law (Civil Service Law § 212 [1]).

The Mayor's reliance on separation of powers principles is also unpersuasive. As the Mayor notes, in *United States v Klein* (13 Wall [80 US] 128 [1871]), the Supreme Court held that a statute was unconstitutional because it purported to "prescribe rules of decision to the Judicial Department of the government in cases pending before it" (*id.* at 146). Prior to the enactment of Local Laws 18 and 19, the unions representing EMTs and FADs could obtain a variation from the citywide agreement only if they were able to persuade the Mayor that "considerations special and unique" to them were involved (Administrative Code § 12-307 [a] [2]). According to the Mayor, the "practical effect" of Local Laws 18 and 19 "is to require the Mayor to proceed as if he had made a determination that the EMT and FAD members were . . . subject to 'special and unique' circumstances." Thus, or so the argument goes, "the City Council is, just as improperly, attempting to impose rules of decision on the Mayor."

This argument is unavailing for two reasons. First, then-Mayor Giuliani did not challenge the validity of Local Laws 18 and 19 on separation of powers grounds in his complaint, and the current Mayor raised it on this appeal for the first time in his reply brief (*see e.g. Lang v Cohalan*, 127 AD2d 17, 21 [1987], *appeal dismissed* 70 NY2d 744 [1987]). Second, Local Laws 18 and 19 cannot be reduced in this fashion to their "practical effect." The Mayor's argument might well have force if either law expressly provided as follows: "Whenever the union representing [EMTs or FADs] requests a variation from the citywide agreement, the Mayor shall conclude that special and unique considerations are involved." Neither law, however, so provides;

both laws simply amend the law to obviate the need for the Mayor to come to any conclusion with respect to the issue of "special and unique" considerations prior to the onset of negotiations with the unions representing EMTs and FADs. As the Supreme Court recently observed, "[w]hatever the precise scope of *Klein,* . . . later decisions have made clear that its prohibition does not take hold when Congress amend[s] applicable law" (*Miller v French,* 530 US 327, 349 [2000] [internal quotation marks omitted], quoting *Plaut v Spendthrift Farm, Inc.,* 514 US 211, 218 [1995]; *cf. Levitt,* 79 NY2d at 131 ["We are not concerned with what the City *could have done,* but must examine what it *did*"]).

■ The Mayor challenges Local Laws 18 and 19 on the additional ground that they violate both Municipal Home Rule Law § 23 (2) (f) and NY City Charter § 38 (5). In relevant part, each provision of law specifies that a local law is subject to a mandatory referendum if, inter alia, it "curtails any power of an elective officer." Correctly arguing that Local Laws 18 and 19 curtail a power he currently enjoys, the Mayor contends that Local Laws 18 and 19 are invalid because they were not approved by the electors in conformity with Municipal Home Rule Law § 23 (2) (f) and NY City Charter § 38 (5). This contention, however, also is without merit.

Not every local law that "curtails any power of an elective officer" or otherwise falls within one of the paragraphs of Municipal Home Rule Law § 23 (2) is subject to a mandatory referendum. To the contrary, section 23 (2) expressly provides that such a local law is subject to mandatory referendum "[e]xcept as otherwise provided by or under authority of a state statute." Thus, section 23 makes clear that, for example, a local legislative body may by local law curtail a power of an elective officer if the legislative body acts either "under authority of a state statute" or a statute that provides that a referendum is not required (*cf.* 1980 Atty Gen [Inf Ops] 258, 259 [construing Municipal Home Rule Law § 24 (2), specifying that certain local laws are subject to referendum on petition "(e)xcept as otherwise provided by or under authority of a state statute," and concluding that a local law increasing the compensation of county legislators was not subject to referendum "because the increase in compensation is 'provided by or under authority of a state statute' "]).

As an act of the Legislature, section 23 does not bind future legislatures, which remain free to repeal or modify its terms (*cf.*

*Morin v Foster,* 45 NY2d 287, 293 [1978]; *see e.g.* Public Authorities Law § 1045-h [1] ["(n)otwithstanding the provisions of any general, special or local law or charter to the contrary, any action taken by the city pursuant to this subdivision shall not be subject to a permissive or mandatory referendum"]).

Local Laws 18 and 19 are not subject to the referendum requirement of the Municipal Home Rule Law for two reasons: (1) as discussed, the curtailment of mayoral authority they entail—i.e., the requirement that the Mayor negotiate with the unions representing EMTs and FADs over all terms and conditions of employment—is provided for by the Taylor Law, and (2) also as discussed, in enacting both local laws the City Council acted under the authority of the Taylor Law. To be sure, unlike Public Authorities Law § 1045-h (1), no provision of the Taylor Law expressly provides that actions taken by a municipal government pursuant to its provisions are not subject to referendum requirements of Municipal Home Rule Law § 23. But the absence of such a provision is hardly determinative. Indeed, a holding that such express language in a statute is necessary to render inapplicable the referendum requirements of section 23 would render the opening clause of section 23 (2) mere surplusage. After all, that clause—"[e]xcept as otherwise provided by or under authority of a state statute"—would have no legal force or effect if such express language in a state statute were necessary. We cannot, of course, construe section 23 (2) so as to render its opening clause surplusage (*see Sanders v Winship*, 57 NY2d 391 [1982]).

It may be that not every state statute granting powers to a local government can be read to exempt a local law from the referendum requirement of section 23. Municipal Home Rule Law § 10 confers broad police powers on local governments to adopt and amend local laws relating to an array of subjects, including the "compensation, hours of work, protection, welfare and safety of its officers and employees" (Municipal Home Rule Law § 10 [1] [ii] [a] [1]). Accordingly, the Mayor argues that "[s]ince most local laws derive their authority from Municipal Home Rule Law § 10, the referendum requirements of § 23 would be incoherent and useless if § 23 does not apply to local laws adopted under § 10."

This is a formidable argument, but we need not determine whether it is correct. If it is, all that would follow would be that, consistent with the principle that "statutes relating to the same subject matter . . . must be read together and applied

harmoniously and consistently" (*Alweis v Evans,* 69 NY2d 199, 204 [1987]), the Legislature did not intend that Municipal Home Rule Law § 10 be considered a "state statute" for purposes of Municipal Home Rule Law § 23 (2). It certainly would not follow that the Legislature intended nothing by the opening clause of section 23 (2), i.e., intended that the phrase "state statute" encompass no state statute.

The Mayor argues that there is "no evidence that Civil Service Law § 212, allowing the City Council to adopt 'provisions and procedures' in place of certain provisions of the Taylor Law, modifies the preexisting requirements of Municipal Home Rule [Law] § 23." Similarly, the Mayor argues that "[n]othing in § 212 suggests an intent to override the referendum requirement applicable to curtailment." These arguments miss the mark. If, as we are bound to conclude, the Legislature intended the opening clause of section 23 (2) to have legal force and effect—that is, intended that it have "a reasonable field of operation" (*Alweis,* 69 NY2d at 205)—it is of no moment that an intent to override the referendum requirement of section 23 is not apparent on the face of Civil Service Law § 212. Indeed, Civil Service Law § 212 unquestionably is a "state statute" and unquestionably empowers the Council, as a local legislative body, to "adopt[] by local law, ordinance or resolution, its own provisions and procedures" that are "substantially equivalent" to those of the Taylor Law (Civil Service Law § 212 [1]). Because the plain language of a statute is ordinarily controlling (*see People v Finnegan,* 85 NY2d 53, 58 [1995]), the Mayor's arguments erroneously place a burden on the City Council that the Mayor must shoulder. The Mayor provides no reason, and we do not discern one, not to give effect to the plain language of the opening clause of section 23 (2) and conclude that since Local Laws 18 and 19 were enacted in accordance with the authority conferred by Civil Service Law § 212, they are not subject to the referendum requirement of section 23.

The cases cited by the Mayor are not to the contrary. In *Giuliani v Council of City of N.Y.* (181 Misc 2d 830 [Sup Ct, NY County 1999]) and *Ricketts v City of New York* (281 AD2d 245 [2001], *appeal dismissed* 98 NY2d 692 [2002]), the local law curtailing the authority of the Mayor and held to be violative of Municipal Home Rule Law § 23 (2) was inconsistent with the state enabling law. The offending restriction in the local law on the Mayor's powers, accordingly, was not "provided by" or enacted "under authority of" (Municipal Home Rule Law § 23 [2]) that very enabling statute.

Nor does *Mayor of City of N.Y. v Council of City of N.Y.* (280 AD2d 380 [2001], *lv denied* 96 NY2d 713 [2001]) advance the Mayor's position. To be sure, in that case this Court broadly stated that "an enactment that curtails any power of an elected official is inoperative unless subject to a referendum" (*id.* at 381 [citation omitted]). Again, however, the curtailment of the Mayor's authority was not "provided by" or enacted "under authority of a state statute." It is axiomatic, moreover, that a court decides only the case before it (*see Matter of Seelig v Koehler*, 76 NY2d 87, 92 [1990], *cert denied* 498 US 847 [1990]; *Roosa v Harrington*, 171 NY 341, 350 [1902]).[2]

The foregoing is sufficient to dispose of the Mayor's related claim that Local Laws 18 and 19 violate NY City Charter § 38 (5). As noted, that provision also subjects to a mandatory referendum a local law that "curtails any power of an elective officer." Of course, however, the City Charter is itself a local law, and thus may not conflict with a statute enacted by the Legislature (*see Albany Area Bldrs. Assn. v Town of Guilderland*, 74 NY2d 372 [1989]). As applied to this case, that is precisely what City Charter § 38 (5) does. Pursuant to Civil Service Law § 212, the City Council was authorized to enact Local Laws 18 and 19; pursuant both to Civil Service Law § 212 and the opening clause of Municipal Home Rule Law § 23 (2), Local Laws 18 and 19 are not subject to mandatory referendum. In other words, City Charter § 38 (5) cannot apply to Local Laws 18 and 19 so as to make them subject to a mandatory referendum, because state statutes provide they are not subject to a mandatory referendum (*see also* Municipal Home Rule Law § 10 [1] [i] [authorizing every local government to adopt and amend local laws "relating to its property, affairs or government" that are, inter alia, "not inconsistent with any general law"]).

---

**2.** In *Matter of Sacco v Maruca* (175 AD2d 578 [1991], *lv denied* 78 NY2d 862 [1991]), the Fourth Department discussed two sections of the Town Law that the respondent councilpersons apparently contended exempted the local laws at issue from the mandatory referendum requirement of Municipal Home Rule Law § 23 (2). One of those sections of the Town Law, however, expressly conditioned the authority conferred on the Town Board by specifying that it was "[s]ubject to the provisions of sections twenty-three and twenty-four of the municipal home rule law" (Town Law § 58-a). Whether the Fourth Department correctly held that the other section, Town Law § 27 (1), also did not exempt the local law despite the absence of similar qualifying language is not a question we need address. We note, moreover, that the Fourth Department did not purport to hold, contrary to the plain language of section 23 (2), that the need for a referendum could never be obviated by a "state statute" within the meaning of the opening clause of that provision.

The Mayor's reliance on City Charter § 38 (5), moreover, is misplaced for an additional reason. The power of the Mayor that is curtailed by Local Laws 18 and 19 is not a power conferred by the Charter or any state statute. To the contrary, the power (if power it be) is an incident of the provision of the Collective Bargaining Law that effectively stipulates that all employees subject to the career and salary plan are bound by a collective bargaining agreement entered into between the Mayor and the "certified representative or representatives of bargaining units which include more than fifty percent of all such employees" (Administrative Code § 12-307 [a] [2]). To hold that any amendment to this provision that results in some reduction of mayoral authority is subject to a mandatory referendum makes little or no sense. It would mean that what the Council, as opposed to the Charter or a state statute, gives to the Mayor or any other elective officer, the Council cannot take away.

Other anomalous consequences would follow. As the Court of Appeals has stated, "[u]nless specifically provided by statute or charter provisions, one county legislature may not bind the hands of its successors in areas relating to governmental matters" (Morin, 45 NY2d at 293 [citations omitted]). Yet, if the Mayor's position on the scope of City Charter § 38 were accepted, one City Council would bind the hands of its successors whenever a local law it enacts results in any increase in the powers of an elective officer. Having enacted such a local law, no subsequent City Council (nor, for that matter, the same City Council) would have the authority to amend local laws in a way that curtailed the powers previously conferred. Rather, any such amendment would be subject to a mandatory referendum. Successor City Councils thereby would be deprived of their discretionary authority to meet future exigencies (45 NY2d at 293); every City Council would have a strong incentive to be timid about conferring any new powers on an elective officer.

Finally, the Mayor's position entails a contradiction. If these amendments to Administrative Code § 12-307 (a) (2) are invalid on the ground that they are subject to a mandatory referendum, the enactment of Administrative Code § 12-307 (a) (2) also must be invalid. By enacting it, after all, the City Council curtailed the power of subsequent City Councils to legislate over this subject (cf. 45 NY2d at 293-295).[3]

---

**3.** This contradiction can be avoided only on the ground that the City Council's authority to add to the powers of other elective officers is the only

Accordingly, the order and judgment (one paper), of the Supreme Court, New York County (Doris Ling-Cohan, J.), entered January 12, 2005, which, in an action by the Mayor of the City of New York seeking a declaration that Local Laws 18 and 19 of 2001 are unlawful on the ground that they violate the New York Civil Service Law, the Municipal Home Rule Law and the New York City Charter, denied the Mayor's motion for summary judgment and granted the cross motions for summary judgment of the Council of the City of New York and of intervenors-defendants to declare the laws valid and enforceable, should be affirmed, without costs.

BUCKLEY, P.J. (dissenting in part). I agree with the majority that, although the Taylor Law invests the Mayor with the exclusive power and authority to negotiate agreements with public employee organizations (see Civil Service Law § 201 [12]), the act also permits the City Council to adopt provisions and procedures for negotiations (see Civil Service Law § 212), and thus the City Council was empowered to enact Local Laws Nos. 18 and 19 (2001) of the City of New York to exempt EMTs and FADs from the citywide agreement. However, I depart from the majority in their conclusion that neither Municipal Home Rule Law § 23 (2) (f) nor City Charter § 38 (5) requires a referendum on the diminution of the Mayor's powers effected by Local Laws 18 and 19.

The local laws would require the Mayor to negotiate directly with EMTs and FADs such issues as pensions, overtime, and time and leave rules, and deprive him of his former power under the Collective Bargaining Law to bind those two employee groups to the terms of a citywide agreement or negotiate with them the issue whether they might obtain a variation from the citywide agreement. That alteration "curtails" a "power" of the Mayor, thereby triggering the mandatory referendum provisions of Municipal Home Rule Law § 23 (2) (f) and City Charter § 38 (5), unless "otherwise provided by or under authority of a state statute" (Municipal Home Rule Law § 23 [2]).

In contrast to Public Authorities Law § 1045-h (1), which confers certain mayoral powers regarding sewerage and water systems but expressly provides that, "[n]otwithstanding the provisions of any general, special or local law or charter to the

---

power that is not protected by City Charter § 38 (5). That is hardly plausible, as it entails the proposition that the City Charter secures over time an ever-increasing diminishment of the powers of the City Council and concomitant enhancement of the powers of all other elective officers.

contrary, any action taken by the city pursuant to this subdivision shall not be subject to a permissive or mandatory referendum," Civil Service Law § 212 contains no clause to that effect. While the majority is correct that a state statute need not make an explicit declaration that Municipal Home Rule Law § 23 (2) (f) and City Charter § 38 (5) are inapplicable, but rather may obviate the referendum provisions by evincing an intent to do so, no such intent can be gleaned from Civil Service Law § 212. It is entirely consistent to confer upon the Council the authority to establish provisions and procedures for employee negotiations yet require a referendum for those provisions and procedures that curtail a power of the Mayor.

Under the majority's interpretation, Municipal Home Rule Law § 23 (2) (f) and City Charter § 38 (5) are automatically rendered inapplicable when a state statute authorizes a local legislative body to take some action, unless the referendum clause is expressly invoked in the state statute. However, there is no authority for that position, and the important purpose of the referendum requirement, to "preserve[] the franchise of voters to elect candidates to public office" with particular powers intact (1981 Ops Atty Gen No. I 81-10, at 102), should not be lightly disregarded. Accordingly, the preexisting provisions of Municipal Home Rule Law § 23 (2) (f) should not be overridden absent an intent to do so by the State Legislature.

As the majority apparently concedes, the referendum requirement of Municipal Home Rule Law § 23 (2) (f) would be " 'incoherent and useless' " if it did not apply to Municipal Home Rule Law § 10, since the latter is the authorizing source of most local laws. The majority evades that problem by tacitly adopting the position advocated in this dissent: examining the legislative intent of the statute. However, it is unclear why that approach should be restricted to Municipal Home Rule Law § 10, rather than uniformly applied.

The majority also advances the proposition that what the Council gives the Mayor or any other elective officer the Council should be able to take away. That would be a logical assumption were it not for City Charter § 38 (5), which specifically prohibits the Council from taking away, by means of a "local law," "any power" of an elective official without a referendum, unless provided by a state statute. "Any" is an all-encompassing term and does not support an inference that an exception should be made for powers conferred by the Council via local laws. Indeed, City Charter § 38 (5) would have little meaning if it did not ap-

ply to local laws, since, in only limited circumstances, could the Council circumscribe a power bestowed by a state statute or the City Charter.

I also disagree with the majority that the granting of any power by the Council to another elective official necessarily entails the diminution of the powers of the Council itself. The theoretical ability of the Council to not create a new power cannot be deemed a "power" subject to referendum. Otherwise, following the majority's reasoning to its conclusion, as soon as the Council enacts a local law, on any matter, it reduces its own powers, in that it has committed itself to a particular course of action out of a potentially limitless number of options. With respect to the majority's belief that future Councils will be hesitant to confer any new powers upon elective officers, the majority does not explain why it is preferable to have the powers revocable at the whim of the Council.

NARDELLI and GONZALEZ, JJ., concur with McGUIRE, J.; BUCKLEY, P.J., and WILLIAMS, J., dissent in part in a separate opinion by BUCKLEY, P.J.

Order and judgment (one paper), Supreme Court, New York County, entered January 12, 2005, affirmed, without costs.